### UNITED STATES v. PAN–AMERICAN PE-TROLEUM CO.

#### No. B 115 M.

District Court, S. D. California, Central Division.

Nov. 10, 1930.

See, also, 24 F.(2d) 206.

Samuel W. McNabb, U. S. Atty., of Los Angeles, Cal., and Atlee Pomerene, Thomas M. Kirby, and Frank Harrison, Sp. Assts. to Atty. Gen.

T. T. C. Gregory, of San Francisco, Cal., and Gibson, Dunn & Crutcher and Norman S. Sterry, all of Los Angeles, Cal., for defendant.

NORCROSS, District Judge.

This is a suit in equity to cancel three certain leases of land within United States Naval Reserve No. 1 in Kern county, Cal., and for an accounting of the oil and gas produced therefrom. A fourth lease is involved by reason of being a consolidation of the other three. Two of the three original leases were granted directly to defendant, the other to W. R. Ramsey, and by him conveyed to defendant.

The leases cover a portion of sections 1 and 2, township 31 south, range 24 east, and have a combined total acreage slightly in excess of that of a section of land. The leases were referred to upon the trial and are so designated in the briefs as the E, G, and I leases, and will be so referred to in this opinion. The two leases in section 1 are of date December 14, 1921. The G lease in section 2 is of date February 8, 1922. The consolidated lease is of date July 28, 1922.

For a more general description of the leases in question it may be said that the G lease covers substantially the south half of the north half of section 2; the I lease the south half of the northwest quarter of section 1 and the E lease the south half and a portion of the south half of the north half of section 1. The leases are immediately south of three offset leases owned by defendant designated as the F, H, and D leases, covering a strip nine hundred feet wide along the north line of sections 1 and 2 and bordering on sections 35 and 36 in township 30, which latter sections are without the Reserve and are the property of the Standard Oil Company of California. The F and D leases were granted originally to defendant. The H lease was granted to the United Midway Oil Company, and by it conveyed to W. R. Ramsey, who conveyed it to defendant at the time of his conveyance of the I lease. The F, H, and D leases are not and have not been questioned in this or any other suit.

Plaintiff bases its right of recovery on grounds both of fraud and illegality. It is the contention of the government that the said leases are tainted with the same fraud considered and determined by this court in the case of United States v. Pan-American Petroleum Co., 6 F.(2d) 43, as affirmed on appeal in (C. C. A.) 9 F.(2d) 761, and 273 U. S. 456, 47 S. Ct. 416, 71 L. Ed. 734. The case last cited upon the trial and in the briefs has been referred to as the first Pan-American Case, and will be so referred to in this opinion.

In the case of the I lease it is further contended that it was also the result of a subsidiary conspiracy between W. R. Ramsey and defendant; and in the case of the G lease of a similar subsidiary conspiracy between R. J. White and H. T. Coffin and defendant.

With respect to illegality, it is plaintiff's contention that neither the Secretary of the Interior nor the Secretary of the Navy had authority to make any such leases for the purposes for which the leases in question were made, and in the way they were made.

The defenses relied upon may be summarized as three:

(1) That the leases in question were not given as a result of or in any way influenced by fraud or conspiracy to procure them.

(2) That the leases have been ratified by Congress.

**(3)** That the judgment in the first Pan-American Case was upon the same cause of action alleged in this suit, and a bar to recovery by plaintiff in this action.

The issues in respect to fraud, actual or constructive, growing out of the transactions between Albert B. Fall, as Secretary of the Interior, and Edward Doheney, then president of the defendant company, as determined in the first Pan-American Case, in so far as they may have application, are recognized by the parties to this suit as res adjudicata. It will be unnecessary therefore to make other than a brief reference to that case, as the facts presented and law controlling are fully set out in the findings and opinion of the trial court and in the opinions of the appellate courts cited supra. Suffice it now to say that the said first Pan-American Case was instituted in this court by bill of complaint filed March 17, 1924, by special counsel appointed by the President and confirmed by the Senate, in pursuance of Public Resolution No. 4 of the Sixty-Eighth Congress, approved by the President February 8, 1924 (43 Stat. 5). That action was brought to set aside two contracts and two leases, which leases were dated respectively June 5 and December 11, 1922, and covered the major portions of Naval Petroleum Reserves Nos. 1 and 2, and embraced a total of approximately 32,000 acres. That case was tried in October, 1924, and reached final decision by the Supreme Court of the United States on February 28, 1927.

The present suit was commenced on September 3, 1924, by direction of the Attorney General following a letter of the then Secretary of the Navy Curtis D. Wilbur to the then Secretary of the Interior Hubert Work, and by the latter referred to the Attorney General. The original bill of complaint filed sought to cancel the three leases upon the ground that they had been executed by the Department of the Interior instead of the Navy Department, and had not been granted as a result of competitive bidding. To the original bill defendant filed an answer which, in addition to controverting certain allegations, set up as an affirmative defense that the leases had been ratified and approved by Congress. Subsequent to the final decision by the Supreme Court of the United States in the first Pan-American Case and the final termination of the case of United States v. Belridge Oil Co. (C. C. A.) 13 F.(2d) 562, by denial of certiorari by the Supreme Court November 29, 1926, 273 U. S. 733, 47 S. Ct. 242, 71 L. Ed. 864, the plaintiff, on July 28, 1927, filed an amended bill of complaint, wherein for the first time it was charged that the three leases here in question were given as a part of and subject to the same fraud found in the first Pan-American Case. Defendant filed its answer to the amended bill on September 26, 1927, denying the existence of fraud in the making of the leases, and as affirmative defenses setting up ratification by Congress and that plaintiff had split its cause of action.

It was stated at the trial, and restated in the briefs for defendant, that subsequent to filing the answer to the amended bill there was a change of stock ownership of defendant company, the Doheney interests being purchased by the Richfield Oil Company of California. This stock transfer was followed by a change in attorneys representing defendant. It is not, however, contended that the change in stock ownership affects the issues in any way.

By stipulation of counsel the evidence and proceedings in the first Pan-American Case are to be considered in this case; also that the evidence taken before the Supreme Court of the District of Columbia upon the trial of Fall and Doheney for conspiracy, and evidence taken on hearings before the Senate Committee on Public Lands investigating the matter of the Naval Petroleum Reserves, in so far as pertinent to the issues in this case and offered by either party, is to be considered in determining the issues involved in this case.

For a proper understanding of the questions presented, it is important to consider the history of the F, H, and D leases as well as those now involved, together with a brief reference to the establishment of the Naval Petroleum Reserve No. 1, and certain acts of Congress and official action taken by department heads concerning its administration. In this connection consideration must be given to certain mining locations made, or attempted to be made, on sections 1 and 2 prior to the withdrawal of lands within the Reserve and the creation thereof.

On September 27, 1909, the Secretary of the Interior withdrew from entry certain supposedly oil lands subject to existing mining claims or locations.

By Act of Congress of June 25, 1910 (43 USCA §§ 141–143), express power was conferred upon the President to make such withdrawals. On July 2, 1910, the President confirmed the prior action of the Secretary of the Interior.

On September 2, 1912, President Taft created Naval Reserve No. 1 in California "subject to valid existing rights."

On February 12, 1920, Standard Oil Company brought in its first well on section 36, just outside the Reserve, with an initial daily production of 5,359 barrels. This was followed by the rapid drilling of two rows of wells, 18 in number, across the entire south boundary of the section.

By Act of Congress of February 25, 1920, what is commonly known as the General Leasing Act (30 USCA § 181 et seq.) became a law empowering the Secretary of the Interior to grant leases upon mineral lands. By section 18a (30 USCA § 184 note) the President was authorized to compromise claims based on placer locations made prior to the establishment of Naval Reserves, the validity of which claims were in question.

On March 5, 1920, Secretary of the Navy Daniels addressed a letter to the Chairman of the House Naval Committee in which he called attention to certain provisions of the said Act of February 25, 1920, and stated:

"Under the provisions of this Act considerable areas of the petroleum reserves will come into the undisputed possession of the Navy. Some of these tracts are drilled to such an extent that it will be necessary for the Government to drill offset wells unless oil to the value of millions of dollars is to be drawn from under the Government lands by private owners. * * * It, therefore, becomes imperative, even when viewed from an economic standpoint only, that machinery be provided whereby wells may be drilled for protection against drainage from adjacent lands, or to supply oil for the Government's needs. * * * It is suggested that this may be accomplished by an addition to the provision 'Investigation of fuel oil,' as contained in the Naval Appropriation Act, approved July 11, 1919, similar to the following:

"That the Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves as are or may become vested in the United States; to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease or otherwise, and to use, store, exchange, refine, sell or otherwise dispose of the oil and gas products thereof, and those from all royalty oil, for the benefit of the United States."

A consideration of the suggestions of Secretary Daniels resulted in the Act of Congress of June 4, 1920, § 1 (41 Stat. 813), containing the following provision that: "The Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves as are or may become subject to the control and use by the United States for naval purposes, and on which there are no pending claims or applications for permits or leases under the provisions of sections 223–229 of Title 30, Mineral Lands and Mining, or pending applications for United States patent under any law; to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States: And provided further, That the rights of any claimant under sections 223–229 of Title 30 are not affected adversely thereby." 34 USCA § 524.

It will be observed that Congress by this act modified the suggestions of the Secretary by excepting from the possession and control of the Secretary of the Navy those portions of the naval reserves on which there were "pending claims or applications for permits or leases" under the act of February 25, 1920, "or pending applications for United States patent under any law," and providing further "that the rights of any claimant under sections 223–229 of Title 30 are not affected adversely thereby."

On May 31, 1921, the President issued an executive order putting the matter of leasing of lands within the Naval Reserves in charge of the Secretary of the Interior, the order making special reference to the act of February 25, 1920. This order was held to be invalid in the first Pan-American Case.

On April 14, 1921, Secretary of the Navy Denby called for "sealed proposals * * * for a lease * * * along the north side of section 1 * * * nine hundred feet wide and to have drilled thereon twenty-two wells in two rows * * * as rapidly as men, material and supplies can be obtained."

The defendant was found to be the highest and best bidder. Two leases were subsequently entered into in pursuance of such bid, being the H and D leases hereinbefore referred to.

While the Pan-American Company was the highest bidder for the lease on section 1, the H lease was made direct to the United Midway Oil Company for the following reasons: Prior to the withdrawal of the land within the Naval Reserve from entry and the establishment of such reserve, the United

Midway Company had filed notices of placer locations covering section 1 and section 12 to the south thereof, and had begun the drilling of a well for oil on section 12. Following an expenditure approximating $130,000, including drilling on section 12 to a depth of 4,856 feet, the efforts of the United Midway Company ended in a "dry hole."

On October 16, 1920, the United Midway Company filed with the Secretary of the Interior an application for a prospecting permit covering section 1 under the provisions of the General Leasing Act. This application was denied by Secretary Payne on November 8, 1920. On February 11, 1921, the United Midway Company made application to the Secretary of the Interior for a compromise of its claim under the provisions of section 18a of the General Leasing Act. In support of this latter application, counsel for the Midway Company submitted a brief or argument in which, among other matters, attention was called to the Standard Oil Company's operations on section 36 to the north and the necessity for offset wells. This application was denied by Secretary Payne on February 24, 1921, by a letter stating in effect that, while placer locations had been made prior to withdrawal, and expenditures made as claimed, no discovery of oil or gas had been made, nor had work diligently been carried on from 1910 to that time. On the following day, February 25, 1921, the United Midway Company filed an application with the President for a compromise of its claim, which application was by the President referred to Secretary Payne, who on March 2, 1921, replied by reference to his said letter of February 24th.

Shortly following the change of administration on March 4, 1921, the United Midway Company made a request of Secretary Fall for favorable action upon its application for a compromise. Secretary Fall referred the matter to Assistant Secretary Finney, who on April 7, 1921, replied by letter from which the following excerpts are taken: "Mr. McMurray has talked the matter over with me, pointed out the equities of his client, also pointed out that this section 1 adjoins on the south, section 36 owned by the Standard Oil Company, from which 40,000 barrels of oil per day are being produced, and that evidently a considerable part of this oil is coming from under section 1. Should it be determined that his client has equities which should be taken care of, three courses are possible: (1) to submit to the President an offer of compromise, which would involve giving a lease to the company of a part or all of the land in section 1; (2) eliminate said section from the Naval Reserve; (3) under the authority of a clause in the Naval Appropriation Act, copy attached, the Secretary of the Navy might permit the company to put down wells on the said section 1, as an offset to the wells on the Standard Oil section, upon such royalties as might be agreed upon. I am inclined to think that its equities might be recognized to the extent of authorizing it to drill a limited number of wells along the north line of section 1, on payment of the royalties fixed in the regulations. Our justification would be that it was an offset to drainage by the Standard. I think the Secretary of the Navy should be consulted, however, before any commitment is made."

Disposition of the requests or claims of the United Midway Company had not been made at the time bids were received for the drilling of offset wells along the northern boundary of section 1.

It appears that Secretary Fall called the attention of Mr. Doheney to the pending application of the United Midway, and suggested as a means of disposing of the same that the Pan-American Company relinquish to the United Midway Company a portion of the lease on section 1 to which it would otherwise be entitled. The matter was taken up with the United Midway, and an agreement reached to the effect that the Pan-American Company would release to it a portion of the offset lease for which the Pan-American Company was the successful bidder, representing ground to be covered by eight wells. On July 8, 1921, Secretary Fall in a letter to the President reviewed the history of the United Midway claim, and recommended that it be compromised in accordance with the agreement made with the Pan-American Company. The President approved. This accounts for the H lease being made direct to the United Midway.

### Subsidiary Conspiracy, I Lease.

■ W. R. Ramsey succeeded to the interests of the United Midway Company in the H lease, and associated with himself the Continental Asphalt Petroleum Company. The first wells brought in on the H lease were extremely disappointing to Ramsey and the Continental Company. Under the terms of the bid of the Pan-American Company they were required to pay a royalty of 55½% of the oil produced. It cost about $75,000 to drill and equip a well. Ramsey and the Continental Company were under a bond of $50,000, with a guaranty that they would carry

out the provisions of the lease. There is testimony to the effect that Ramsey and the officers of the Continental Company seriously considered that, unless they could induce the government to make a material reduction in royalties, it would be more profitable to them to abandon the lease and forfeit the bond. Before taking up the matter directly with the government authorities, they proposed to the Pan-American Company that it join in a similar request. Representatives of the two companies first presented the matter to Assistant Secretary Finney.

Edward C. Finney, Solicitor of the Interior Department and formerly Assistant Secretary of the Interior, testified for the plaintiff to the effect that some time between the middle and 22d of November, 1921, Mr. Staggers, representing Ramsey and the Continental Company, and Mr. Cotter, representing the Pan-American, called personally on him at his office at Washington, and stated that they had come to seek a reduction in royalties because their respective companies were losing money; that he told them that the royalties had been fixed upon competitive bidding and there were other bids of approximately the same amount, and that he did not think the Department would be warranted in giving any relief by reduction of royalty; that if they wanted a formal decision the thing to do was to file written applications; that upon the same or the following day he advised Secretary Fall of the visit of Staggers and Cotter, and that the Secretary agreed with the views he had expressed, but said that some relief in the way of additional leases might be considered.

A letter of date November 22, 1921, addressed to the Secretary of the Interior, signed by J. J. Cotter for the Pan-American Company, referring to the situation respecting the D lease, among other matters, stated:

"We have drilled upon this land two (2) wells which are producing by pumping 225 barrels each per day; we have drilling six (6) additional wells, several of which are nearing completion; and we have several more rigs up ready to commence work. Our expenditures on this land up to October 1st have been $540,000.00.

"At the time this lease was issued, every one concerned, including the Geological Survey and ourselves, expected that this would be large producing territory. The confident expectation, which was practically accepted as a fact, that large flowing wells would be obtained on this land, was the only justification for the unprecedented royalty fixed in the lease. As justifying this expectation it may be stated that nine wells drilled by the Standard Oil Company along the South line of Section 36, adjoining our strip of land on the North, had an average initial production of 3,284 barrels per day, whereas these same nine wells now have an average production of 711 barrels per day, and five of them are producing from 240 to 330 barrels each per day, and another, string of nine Standard wells to the North of the row just mentioned had an average initial production of 2,511 barrels per day, which has now decreased to an average daily production of 465 barrels.

"The gas pressure in this land is gone, and instead of getting large flowing wells, the wells come in as moderate pumpers."

On November 23, 1921, a letter signed by Staggers as attorney was addressed to the Secretary of the Interior, stating, among other matters, that three of the eight wells had been completed, two were in course of drilling, and that grading and other preliminary work for the other three was finished; that there had been expended to date on the lease $322,674, not including prior expenditures, which, if considered, would make a total in excess of $500,000.

From the letter the following excerpts are quoted:

"Of the three wells we have completed, one is practically a dry hole. Our No. 2 well pumped 200 barrels when it came in ten days ago, and then sand trouble occurred. * * * Our third well initial production is slightly over 200 barrels and will settle down to very much less than this.

"Our lifting cost * * * is so great that we cannot commercially operate the lease and pump the oil at the existing royalty, much less can we ever hope to recover any of the large sums of money which we have expended in developing and drilling this property, and we earnestly petition your department for a prompt revision of our contract based on equitable royalties. * * *

"Three of the four wells of the Standard Oil Company offsetting our lease on the north, came in in excess of 6,000 barrels initial production. * * * "

The letters on behalf of both the Continental and the Pan-American Company requested reduction in royalties and made no mention of relief by leases of additional ground at reduced royalties.

The evidence discloses that a number of

communications concerning the matter passed between representatives of Ramsey and the Continental Company and representatives of the Pan-American Company, including a conference with Doheny. In so far as Ramsey and the Continental Company are concerned, they show nothing more than a desire upon their part to get whatever relief possible from the high royalties of the H lease, and to that end sought and secured the co-operation of the Pan-American Company regarded by them to be in a similar situation respecting its D lease.

Some question is presented in the record as to who first suggested the granting of additional leases instead of a reduction of royalties. Staggers in his deposition testified that he thought he was first to make the suggestion. While from Mr. Finney's direct testimony it may be inferred that Secretary Fall first made the suggestion of additional land, he admitted his memory was not as fresh as when testifying at the conspiracy trial nearly three years before, at which trial he testified: "My recollection is that I told them (Staggers and Cotter) there was no probability of their getting a reduction in royalty for the well leases because they were awarded by competitive bidding. Either on that occasion or a day or two afterwards some suggestion was made, I think by Mr. Cotter or Mr. Staggers, of the possibility of getting additional lands. * * *" According to the testimony of Staggers he did not make the suggestion to Finney until after he "had had a talk with Secretary Fall asking for a reduction of the royalty." In so far as it may affect the question now particularly under consideration in respect to the I lease—a subsidiary conspiracy—it is of no particular importance who first suggested additional ground in lieu of reduction of royalties. If relief from the high royalties was to be considered at all, there were but two ways of accomplishing it, either by reduction of royalties or additional leases at lower royalties.

At some time before final action was taken the matter was referred to the Bureau of Mines. From the deposition of H. Foster Bain, Director of the Bureau, the following excerpts of his testimony are taken: "My recollection is that I was informed, either by Mr. Ambrose or by Mr. Finney, possibly some one else, that application had been made to the Department for reduction in royalty. * * * My advice was asked first as to the reduction of that royalty and the recommendation of our Bureau was to the effect that if

possible not to reduce the royalty or to allow the cancellation of the leases for the reason that securing a high royalty like that on a piece of ground placed the government in a much more advantageous situation in regard to negotiating leases on adjacent ground than we would be in case the lessees threw up those leases. * * * When this matter was under discussion in the Department and we had urged against the granting of reduction of royalty and also expressed our strong hope that means would be found to keep the lessees from throwing up the leases, we also advised the Secretary that in our judgment the royalties were much higher than anyone could afford to pay upon that ground, and that the chances were that unless some concessions were made to the lessee he would find it to his advantage to simply abandon the lease. * * * At that time alternative methods of satisfying the lessee were brought up for discussion. I do not remember where they originated or who made the suggestion, but they were talked over in the Department as between the Bureau and the Department head and took the form of the suggestion that additional land be leased to the lessee at a lower royalty so that the burden of the total of the land that he had would be such as to permit him to continue operation and we would still have the high royalty on the particular land which had already been leased. We recommended in favor of that. * * * We believed that additional ground should be leased and would be leased within a somewhat reasonably nearby period * * * for the same reason which had led the Department originally to lease the first northern strip; that is the fact that the ground was being drained; to head that off."

Another fact affecting the situation was a drop in the market price of oil per barrel of approximately one-third below the prevailing price at the time of the execution of the D and H leases.

The matter was under consideration for three weeks or more before the leases were directed by Secretary Fall to be issued, and they were finally executed by Assistant Secretary Finney on December 14, 1921.

On January 26, 1922, W. R. Ramsey, by J. W. Staggers, his attorney in fact, submitted a bid for drilling eighteen wells along the north line of section 2 upon a 50 per cent. royalty. On February 6, following, this bid was withdrawn. Ramsey in his deposition testified that he knew nothing about the bid

having been made and that he did not authorize it.

On March 25, 1922, Ramsey sold the H and I leases to the Pan-American Company for a consideration of $750,000.

▉ Upon the question—whether there was a subsidiary conspiracy between W. R. Ramsey. and the defendant—it is clear that the evidence will not support such a conclusion. It is not contended, nor is there any evidence to indicate, that Ramsey or his associates had any knowledge of the transactions between Fall and Doheney which were the basis of the finding of fraud in the former suit and relied upon in this suit. Ramsey and his predecessors in interest had spent a large amount of money in trying to bring in a well on section 12, which, with section 1, they had covered by placer locations prior to the withdrawal of the land from entry. A. J. Pizzini, one of Ramsey's associates in New York, himself a large investor, had been engaged in selling stock and securities of the Continental Company to help finance the drilling of the H lease. The wells brought in were naturally a great disappointment. To comply with the terms of the contract meant a further investment of $200,000 or more in addition to the more than $300,000 already expended, not to mention the expenditures made prior to the compromise lease which were a total loss. That under these circumstances men would endeavor to improve their situation is not action out of the ordinary. The natural thing was to seek the co-operation of the Pan-American Company. The subsequent sale of both leases by Ramsey and his associates to the Pan-American Company is not in itself suggestive of other than a legitimate business transaction. The consideration paid for the two leases, while large, would seem not to have comprehended a very great profit considering the total amount of money invested in the enterprise from the beginning. In the meantime two additional wells had been completed on the H lease and two started on the I lease. The sale avoided the necessity of further large financing upon the part of Ramsey and his associates. The evidence will not support a conclusion that the Pan-American Company paid a consideration disproportionate to the value of the property to it. The company was already in the field with a large investment and equipment and desirous of acquiring further land for drilling in the Reserve. There is no evidence of any friendly or even close business relations having existed between Ramsey and his associates, Doheney, or any of the officers of the Pan-American Company. Ramsey, after acquiring the H lease, contracted to sell the product to the Standard Oil Company, and his first efforts of a sale were to the latter company. Upon the part of Ramsey and the Continental at least the evidence supports a business transaction without any facts or circumstances which would support a subsidiary conspiracy between Ramsey and the defendant under the rule requiring fraud to be clearly proven.

### Subsidiary Conspiracy, G Lease.

The G lease was made in compromise of asserted rights based on placer claims covering section 2 located prior to withdrawal of the land from entry and the establishment of the Naval Petroleum Reserve. The evidence concerning these claims is voluminous, but it will be necessary to consider only certain salient facts. On January 1, 1907, nearly three years before the land was withdrawn from entry, R. J. White posted placer location notices containing seven other named colocators, on each of the four quarter sections of section 2. The notices were recorded on January 7th following. The notices recited that the land was located 'for the purpose of boring and mining for oil, asphaltum, gypsum, and other minerals contained therein. On the 23d day of February, 1911, more than a year prior to the creation of the Naval Reserve, the said R. J. White filed in the United States Land Office at Visalia, Cal., an application for patent for all of section 2, reciting therein that he had acquired the interests of the other original locators; that at and prior to the time of making the locations a discovery had been made of large and valuable deposits of fuller's earth upon each of said claims, and that the value of the labor done and improvements made on each of said four claims exceeded $500 and on one exceeded $1,250. A supporting affidavit of two claimed disinterested persons as to the discovery and amount of labor and improvements accompanied the application. With the exception of certain reports made by field investigators, one of date February 26, 1914, and the other of April 6, 1916, no action appears to have been taken by the General Land Office until January 18, 1919, when the Commissioner, by letter addressed to the Register and Receiver at Visalia, directed institution of adverse proceedings. On June 3, 1919, there was filed with the Register and Receiver at Visalia a protest made by the Attorney General upon

request of the Secretary of the Navy, to the issuance of any patent. The protest, after charging that the "application is in fraud of the law and detrimental to the interests of the United States Navy" for alleged reasons therein stated, "requested that a hearing be ordered, upon notice, * * * to the end that said mineral entry may be cancelled and said application for patent be denied." On July 3, 1919, R. J. White filed an answer to the protest and "asks that a hearing be ordered * * * and that thereupon * : * said application passed to patent." A hearing upon the protest was never had. On May 17, 1921, R. J. White and H. T. Coffin wrote to Lieutenant Commander Landis who was the Naval officer in California in charge of the Naval Reserves in that state, referring to the fact that the protest had never been heard or tried and proposing to surrender their claims in consideration of a lease 900 feet wide along the north line of section 2 upon a 20 per cent. straight royalty. On May 25th following Commander Landis wrote to the Chief of the Bureau of Engineering, Navy Department, recommending "favorable consideration" of the White and Coffin proposal. On November 25, 1921, the Chief of the Field Division wrote to the Commissioner of the General Land Office in reply to a letter calling for a report, among other matters stating: "In order to go to hearing on this case it will be necessary to have the land examined by ten acre tracts, samples taken from each tract and exhaustive tests made of these samples. * * * It would undoubtedly be a very expensive and long-drawn out proceeding. * * Furthermore, it was the opinion of the Special Assistant to the Attorney General that it will be best not to take any action in the White case pending the outcome of the hearing in the Evans case." On November 30, 1921, H. Foster Bain, Director of the Bureau of Mines, by direction of Secretary Fall, addressed a letter to five of the principal oil companies operating in California, calling for bids for an offset lease along the north line of section 2, "the bids to be in Washington by December 31st, 1921." On January 3, 1922, Commissioner of the General Land Office Spry wrote to the Secretary of the Interior concerning the proposal of White and Coffin to compromise their claim, and, among other matters, stated:

"Since it will be necessary to drill the land in any event and as the longer the drilling is postponed the greater will be the loss to the Government through the draining which is now going on, it is to the advantage of the

Government to settle the present litigation as soon as possible. * * *

"On the question of the compromise the Secretary of the Navy made the following remarks in his letter of June 28, 1921.

" 'In view of the weakness of this claim, it is believed that the claimants will compromise for a much smaller amount of land than they have indicated in the inclosed letter.'

"In case a compromise is approved by you, the lease might be made under the provisions of 41 Stats. 813. * * * "

On December 30, 1921, associates of R. J. White called upon J. C. Anderson, general manager of defendant at Bakersfield, Cal., and a conference was had resulting in an agreement by the terms of which White would deliver to defendant a quitclaim deed to the government for all his rights or claims of right to section 2 in consideration of an overriding royalty of 7½ per cent. of oil produced upon any lease which might be awarded to defendant in pursuance of its bid. Such a deed was executed by White. Anderson testified to the effect that no one else connected with the defendant company knew anything about the conference had and agreement made with White and his associates until after the agreement was reached. Cotter, attorney for defendant, was at the time at Los Angeles. On January 5, 1922, Cotter wired Assistant Secretary Finney: "We have quitclaim contract * * * am returning to Washington to take matter up with you. * * * " Cotter proposed to Finney that, in consideration of surrendering the quitclaim deed, the defendant be awarded, not only the lease for which it had been determined to be the highest bidder, but that it be granted a lease to the remainder of the section upon what was known as regulation royalties. Finney opposed granting an additional lease for an area greater than the balance of the north half of section 2. The question of the granting of an additional lease appears also to have been referred to the Bureau of Mines. On February 6, 1922, E. A. Holbrook, Acting Director, wrote to Finney, among other matters, stating: "Obviously the Pan American Petroleum Company has the best bid, providing a compromise can be effected for the mining claim this company now holds on section 2. * * * Mr. Bain has been advised * * * they would be willing to turn over * * * quitclaim deed to section 2 provided they would get * * * a lease on the remaining portion of the north half * * * at the Gov-

ernment sliding scale royalty. I think the Department should attempt to make such a compromise." On the same date, February 6th, Assistant Secretary Finney addressed a letter to the Secretary in which he reviewed the situation presented as follows: "Referring to attached memorandum from the Director of the Bureau of Mines, which finds the bid of the ,Pan American Petroleum Company to be the best bid submitted for the drilling of 18 wells on the north line of Sec. 2, T. 31 S., R. 24 E., I have to advise you that after bids had been called for it was discovered that the entire Sec. 2 was covered by a mining claim located in 1907, long prior to any withdrawal, as a fuller's earth placer mining claim; that the title of the locators was acquired by R. J. White, who filed application for mining patent therefor, and that said application is still pending and uncancelled, and that so long as this mining application is of record and undisposed of this Department would be without authority to lease or dispose of the lands to any one else. The record was in California in the hands of the Field Division of the Department of the Interior and the Department of Justice, and no action thereagainst had been taken. As you know, to clear the record it would be necessary to prefer charges against the application, to prove that the location was invalid or that the law had not been complied with. Under our practice, this would involve the ordering of a hearing and taking of testimony, the right of appeal from the local office to the General Land Office, and to the Secretary of the Interior; also if decision were adverse, the mineral applicants might carry the matter into courts, and tie the land up for months or years. If they were successful, they would obtain a patent for the entire section, which patent, in my judgment, would carry with it the right not only to fuller's earth but to all other minerals in the land, including oil and gas. Meanwhile, during any proceedings which might be had in this Department or the court, the land would be drained of its oil by the wells on adjoining patented land. The Pan American Petroleum Company, learning of this situation, has secured from the mineral applicant a quit-claim deed to the United States to all of Sec. 2, which they agree to surrender and turn over to the United States, compensating the mineral applicants, upon condition that the bid of the Pan American Petroleum Company, which, as stated is the best bid received, in any event be accepted and an additional area in the north part of Sec. 2 be leased to them at regulation royal-

ties. This seems to be the only practicable solution of the difficult situation in which this Department finds itself, with respect to said Sec. 2. If not accepted, protracted litigation in the Department and the courts will ensue and the Government meanwhile suffer the loss of the oil and gas beneath the land by drainage."

Secretary Fall wrote his approval on the letter of Assistant Secretary Finney. On February 8, 1922, the F and G leases were executed by Assistant Secretary Finney. On March 1, 1922, Commissioner Spry wrote to the Register and Receiver at Visalia, concerning the White application for patent, stating: "The records disclose that all of Sec. 2 has been quit-claimed to the United States by the freeholders of the mining title of the claim in connection with leases Visalia 010042 (a) and (b). The said application is accordingly hereby finally rejected and the case closed. * * * So note your records."

There is nothing in the entire record concerning the G lease that would warrant the conclusion of a subsidiary conspiracy between White and Coffin and the defendant. It is true that both the Navy and the Interior Departments had taken the position that the White claims were invalid. That position was challenged upon the part of White and his associates, who more than two years before had asked that a hearing be ordered. The evidence does not warrant a conclusion that White and his associates did not believe they could establish a discovery and hence were trying to perpetrate a fraud. Whether or no there was a legal discovery on each of the four placer claims is not a matter to be determined in this suit. Even in a case like the present, where the question of discovery is not subject to direct attack, the evidence in respect to discovery might be so weak that the court would be justified in saying that a claim of discovery might be regarded as a badge of fraud. There is, however, nothing in the evidence in this case that would justify the court in arriving at any such conclusion. Before it could be said that White and his associates had not made a valid discovery, they were entitled to have their day in court, and it appears to have been the opinion of those best qualified to express themselves in such a matter that, for the government to be prepared to meet that issue, if it could be successfully met, would be after a long and expensive investigation upon the ground. In dealing, as we are here, with the question of the good faith of claimants to patent, it may

be noted that, in a case where the question of discovery is directly involved, all that is necessary for the locator to show is that he has made such a discovery as would justify a reasonably prudent person in the expenditure of money and labor in developing the claim with the reasonable expectation of finding minerals in paying quantities. Cameron v. United States, 252 U. S. 450, 40 S. Ct. 410, 64 L. Ed. 659; Erhardt v. Boaro, 113 U. S. 527, 5 S. Ct. 560, 28 L. Ed. 1113; Chrisman v. Miller, 197 U. S. 313, 25 S. Ct. 468, 49 L. Ed. 770; United States v. Iron Silver M. Co., 128 U. S. 673, 9 S. Ct. 195, 32 L. Ed. 571. Assuming that White and his colocators had made a valid discovery of fuller's earth, then they had, not only a right ultimately to obtain a patent for the section, but a right to the immediate possession and to extract minerals therefrom. By discovery and perfected location the government has already parted with all its valuable mineral rights and retains only the naked legal title in the land. Forbes v. Gracey, 94 U. S. 762, 24 L. Ed. 313.

It was recognized by all officials dealing with the situation that, before the offset lease on the north line of section 2 should be granted under the call for bids, the White and Coffin claim should be disposed of. True it is that in the award of the G lease the negotiations were directly with the defendant who held the quitclaim deed from White, but it is also true that defendant held that deed subject to a valuable consideration in the form of an agreement for overriding royalties. The negotiations were conducted upon the part of the government practically entirely by Assistant Secretary Finney and the Bureau of Mines. Finney testified: "We tried to drive as hard a bargain with them as we could." While it is to be conceded, as has frequently been held, the mere fact that the settlement may have been one favorable to the government is no defense in a case where fraud is established, it does not appear that any fraud was involved in the granting of this lease, and particularly is that true in so far as any asserted subsidiary conspiracy between White and Coffin and defendant is concerned.

### G and I Protection Leases.

While in the granting of the G and I leases other purposes primarily occasioned their immediate execution, it is the contention of the defendant that they should be regarded and were in fact so made as leases to protect against drainage. The evidence supports this contention. By July, 1921, the Standard Oil Company had produced, from section 36, 11,267,000 barrels of oil. Frank M. Anderson, an oil geologist of wide experience, testified for defendant that he had made an estimate of the amount of oil drained from beneath the Naval Reserve by the Standard Oil Company by its wells, on sections 35 and 36, to have been 10,500,000 barrels by April, 1924. At the time of the trial the witness estimated from reports, showing the total oil production and knowledge obtained concerning the location and dimensions of the oil pool, that the Standard Oil Company had produced, from sections 35 and 36, 20,000,000 barrels of oil more than was susceptible of production from oil originally below the surface of those sections. If this estimate is substantially correct, and the court is convinced, not only from the testimony of this witness, but from that of other expert witnesses, that it is, then the fact is that the major portion of this large amount of drainage production came from the Naval Reserve.

This testimony was admitted subject to the objection of counsel for plaintiff that it was immaterial. The court is of opinion it was admissible. While the known condition in respect to drainage at the time of the trial may, and doubtless should not be, determinative of the knowledge of and consideration given to the subject of drainage at the time the leases in question were granted, it is competent to show that opinions then expressed and consideration of the subject given were borne out by subsequent events. It has some evidentiary value as to the fact that those dealing with the matter of the leases in question were giving some consideration at least to a question of so great importance. Whatever of doubt there may be upon other questions presented upon the trial, the evidence is conclusive, not only of the necessity for protection against drainage from the Reserve by reason of the wells on sections 35 and 36, but that such protection to be effectual required that the wells on those sections be substantially duplicated upon the adjoining Reserve sections both in time and numbers. The evidence is conclusive that the F, H, and D leases were wholly inadequate to protect sections 1 and 2 from the mass drilling inaugurated on the two sections to the north, even if such leases had been granted in time instead of many months too late.

Arthur W. Ambrose, who at the time of the making of the leases in question was holding the position of petroleum technologist of the Bureau of Mines, testified that, at the time

of the making of the H and D leases, his "opinion was that two rows of wells would not ultimately amply protect the government's interests in section 1." With respect to section 2 the witness testified: "Two rows of wells in section 2 would hardly be considered ample unless the production ended. In other words if there was no production farther to the south." The witness further testified he thought he had discussed the matter with Director Bain and Admiral Robinson during the fall of 1921. What Ambrose doubtless had reference to by his expression, "production farther to the south," was the fact that the Pacific Oil Company, then the owner of section 35, had completed six second-line wells and three first-line wells along the section line between sections 2 and 35, and was not drilling any more first-line wells. The Pacific Company had on June 13, 1921, written a letter to Lieutenant Commander Landis suggesting certain arrangements be entered into with respect to the various holdings of the company· with the Reserve. Among other matters the letter stated: "It proposes that the Pacific Oil Company agree not to drill any more wells within 900 feet of the Navy land for a certain period of time. ꞏ * * In return for this it proposed that the Navy agree not to have any wells drilled adjacent to the lines of the Pacific Oil Company. * * * It must be understood that the Pacific Oil Company * * * cannot obligate itself to stay further away from the lands than 900 feet, on account of the impossibility of telling just where the oil will be found."

This letter was referred by Landis to the Secretary of the Navy by letter dated June 22, 1921, in which he stated: "The Pacific Oil Company does not intend to drill any more wells in that section less than 900' from the edge of the section." On June 29, Secretary Denby referred the correspondence to Secretary Fall, who on July 18, 1921, wrote to the Pacific Company, among other statements, saying: "I shall be glad if your company will do no other than necessary defensive drilling in the reserve pending the outcome of 'negotiations. Meanwhile it is my intention to grant no drilling rights * * * other than such rights as it may prove necessary to grant in the settlement of pending claims or to offset wells already drilled or to be drilled on private lands and so situated as to draw oil from the ·Government reserves."

It appears for a time at least there was an impression that the second-line wells on section 35, slightly over 900 feet from the line, would not drain from section 2. Counsel for the government in this case have questioned the propriety of the Interior Department calling for bids for offset wells along the entire north line of section 2, when there were but three first-line wells in the southeast corner of section 35. However commendable may have been the motives of the officials of the Pacific Company, in suggesting no wells be drilled within the reserve as long as that company kept 900 feet distant from the line, the fact is that four of the company's six first-line wells had an average initial production of 2,400 barrels per day, and one was a 3,500 barrel per day well. One first-line well close to the border line completed September 8, 1920, had an initial production of 4,500 barrels per day. Expert testimony upon the trial of this case is convincing to the court that wells of this character would drain for a distance of a mile or more. Professor Anderson testified: "The radius of drainage extends to the limit of the pool in this case; and to say that wells drain the territory for the distance of a mile around is a.moderate statement. * * ꞏ 900 feet is negligible in the drainage area of a well in this field." With respect to the situation existing at the time the leases on section 2 were made, the witness expressed it as "a condition of acute emergency."

### Legality of G and I Leases.

▮▮ Having found that the G and I leases are free of any element of fraud in their execution, and that they were granted as protection leases, other questions respecting their legality are determined adversely to the government's contention in the case of United States v. Belridge Oil Co. (C. C. A.) 13 F. (2d) 562, involving the offset lease along the east line of section 34.

### The E Lease.

The E lease stands in a different situation in some respects from either the G or I leases heretofore specially considered. While not so clear as in the case of the other two leases, the evidence supports it being regarded as a protection lease. There is nothing that will justify the conclusion, as in the case of the I lease, that the defendant, as owner of the D lease, would have abandoned that lease unless further relief of some sort was granted. Regardless of the element that the facts may have justified the leasing of section 1 in its entirety as a protection measure, there remains the further element that the relationship between Secretary Fall and Doheney would render any transaction between de-

fendant and the Interior Department at least void as against public policy unless it was clearly shown that the lease was executed under such circumstances as to negative the possibility of any such influence. The evidence in this case will not support such a conclusion, and the E lease should be declared void unless merit exists in defendant's contention of congressional ratification or in its defense of split causes of action.

■ There is much force in the contention that, this lease having been submitted to congressional investigation along with the other leases considered, it was ratified by Congress, as was held in the case of the Belridge lease, cited supra. See, also, United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131; Butte City Water Co. v. Baker, 196 U. S. 119, 25 S. Ct. 211, 49 L. Ed. 409; Mattingly v. District of Columbia, 97 U. S. 687, 24 L. Ed. 1098; United States v. Midwest Oil Co., 236 U. S. 459, 35 S. Ct. 309, 59 L. Ed. 673; City of Findlay v. Pertz (C. C. A.) 66 F. 427, 29 L. R. A. 188; Baker v. United States (C. C. A.) 27 F.(2d) 863.

The E lease, as well as the other leases involved in this suit, is clearly distinguishable in character from the leases which Congress, after an exhaustive investigation, by resolution determined actions should be brought to set aside. What actuated Congress in directing suits against certain particular leases and contracts is expressed in the decisions in the first Pan-American Case and in the case of Mammoth Oil Co. v. U. S., 275 U. S. 13, 48 S. Ct. 1, 11, 72 L. Ed. 137. Speaking of the leases and contracts involved in the first Pan-American Case, 273 U. S. 456, 47 S. Ct. 416, 425, 71 L. E. 734, the Supreme Court said: "It was the purpose of those making the contracts and leases to circumvent the laws and defeat the policy of the United States established for the conservation of the naval petroleum reserves."

In the Mammoth Case it was said: "The lease and supplemental agreement were fraudulently made to circumvent the law and to defeat public policy."

The granting of defensive leases to prevent drainage clearly did not circumvent the laws and defeat the public policy of the United States in respect to the Naval Petroleum Reserves. While it was the policy of Congress to maintain reserves of oil in the ground for future contingencies, it was recognized that within and upon the borders of the reserves there was privately owned land, and that drainage from the reserve was an ex-

tremely important matter to be dealt with. Space will not permit a review of the evidence upon the subject of drainage which went before the Senate Committee dealing with the whole subject-matter of leases and contracts concerning the Naval Reserves. The broad scope of the Committee's investigation is indicated by the letter of its chairman to Director Bain of the Bureau of Mines, stating: "The committee desires the fullest information from engineering, operating and business viewpoint * * * and you will please report in full your views along this line." In the comprehensive letter of Dr. Bain, of date November 30, 1923, in reply, appears this statement: "It was mentioned earlier in the memorandum that 'loss due to delay in drilling is in places as much as 50 per cent' and accordingly it was considered most conservative to estimate the 'loss in ultimate total production from the reserves' as twice that already incurred from failure to drill the particular 25 line wells indicated, or, as stated, '6,800,000 barrels, worth $8,800,000.'"

Attention is also directed by counsel to the report made by M. L. Requa to Lieutenant Commander Landis of date December 16, 1916, which was before the Committee, and in which appears this statement relative to the distance wells might affect drainage: "Over a period of many years and with the tremendous stake involved, I would not personally feel satisfied even with an intervening space of a mile between a Government reserve and the nearest producing oil wells."

■ Courts should be reluctant, however, to hold a ratification by Congress where questions of fraud enter into consideration, if the cause can be determined upon other questions presented. In the Belridge Case the Circuit Court of Appeals of this Circuit pointed out that no question of fraud was involved in the lease under consideration in that case.

### Split Cause of Action.

■ Defendant's sixth and seventh defenses present the question whether, by not including the leases under attack in this suit in the former suit, plaintiff split its cause of action and, hence, the judgment in the former suit is determinative of the extent of recovery and a bar to this action.

Considering a similar question to that presented here, the Supreme Court in United States v. California & Oregon Land Co., 192 U. S. 355, 24 S. Ct. 266, 267, 48 L. Ed. 476, said: "But the whole tendency of our decisions is to require a plaintiff to try his whole

cause of action and his whole case at one time. He cannot even split up his claim (Fetter v. Beale, 1 Salk. 11; Trask v. Hartford & N. H. R. Co., 2 Allen [Mass.] 331; Freeman, Judgm. 4th Ed. §§ 238, 241); and, a fortiori, he cannot divide the grounds of recovery."

The Supreme Court in the first Pan-American Case, while holding that the general principles of equity "will not be applied to frustrate the purpose of its laws or to thwart public policy," held that they "are applicable in a suit by the United States to secure the cancellation of a conveyance or the rescission of a contract." No such question is here presented in the application of the equitable principle against splitting causes of action as was under consideration in the exception noted in the decision.

As was said by the Circuit Court of Appeals of this Circuit in Mountain Copper Co. v. United States, 142 F. 625, 629: "It is the well-established law that, when the government comes into a court asserting a property right, it occupies the position of any and every other suitor. Its rights are precisely the same; no greater, no less."

The question here to be determined is whether a right of action in plaintiff to set aside all or any of the leases involved in this suit, for the fraud considered and determined in the first Pan-American Case, is but a part of a cause of action tried and determined in that case. The general rule against splitting causes of action is conceded, but it is contended in effect that, because in this case the court is dealing with separate and distinct leases covering a portion of the Naval Reserves not embraced within the leases involved in the former suit, the demands are several, even though they are all affected by, and grew out of, the same fraud.

As applied to actions for the recovery of land, Corpus Juris states the rule as follows: "The rule against splitting a cause of action applies to actions for the recovery of land. Consequently a party claiming title to a single undivided tract or parcel of land cannot maintain different actions to recover different portions thereof, but different actions may be maintained to recover separate tracts of land claimed under different titles." 1 C. J., p. 1120, § 304.

This is a case where the government as proprietary owner of the land is seeking in different actions to recover from the same defendant, because of the same fraud in their procurement, different portions of a single undivided tract or parcel of land—Naval Reserve No. 1—held under various leases. The mere fact that several leases of different dates and purporting to convey different portions of the same tract were issued as the result of the same fraud affords no substantial reason for not holding that the granting of all the leases so affected by the fraud constitutes but one cause of action. It is the agreement or understanding between the parties to accomplish a purpose unlawfully followed by the accomplishment of such purpose in whole or in part which constitutes the cause of action, and to whatever extent accomplished results in but one cause of action.

It is conceded in this case that the question of fraud is res adjudicata. It would be an unreasonable rule which would say to a defendant, you are bound by the determination in the former suit as to the issue of fraud, in a case where a plaintiff is demanding further relief based on the same alleged fraud.

As said in Union Central Life Ins. Co. v. Drake (C. C. A. 8 Circuit) 214 F. 536, 545: "The true test of the identity of causes of action is the identity of the facts essential to maintain them."

There can be no question but that the facts essential to maintain the issue of fraud in this case are the same as in the prior suit. The only difference in the remaining facts is in the mere detail of leases affected.

In the case of Baltimore Steamship Co. v. Phillips, 274 U. S. 316, 47 S. Ct. 600, 602, 71 L. Ed. 1069, the Supreme Court said: "A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. * * * 'The thing, therefore, which in contemplation of law as its cause, becomes a ground for action, is not the group of facts alleged in the declaration, bill, or indictment, but the result of these in a legal wrong, the existence of which, if true, they conclusively evince.' "

The legal wrong accomplished by the transactions of Fall and Doheney was the making of a number of leases and contracts affecting Naval Reserves 1 and 2. The leases and contracts considered severally were but incidents of the one legal wrong.

In Chesapeake & Ohio Ry. Co. v. Dixon, 179 U. S. 131, 21 S. Ct. 67, 70, 45 L. Ed. 121, it is said: "The cause of action manifestly comprised every fact which plaintiff was obliged to prove in order to obtain judgment, or, conversely, every fact which defendants would have the right to traverse."

It can hardly be said that a defendant has any substantial right left if such right is limited to traversing the mere execution of an instrument he is himself relying upon.

Both reason and authority support the view that defendant's defense of split cause of action should be sustained unless some substantial reason exists why the rule should not be applied in this case.

While, as contended by counsel for plaintiff, the rule against splitting causes of action is subject to exception, some very substantial reason must appear before the case is taken out of the general rule. As said in Beltz v. Great Western Lead Co. (D. C.) 251 F. 696, 700, cited by counsel: "It may be done under special circumstances to avoid injustice." No substantial reason appears in this case why the rule should be departed from as appears in the cases cited by counsel for plaintiff. State v. Superior Court, 145 Wash. 576, 261 P. 110; Howell v. Bank, 149 Wash. 249, 270 P. 831.

It is contended that the rule being a procedural one is within the control of Congress. The case, supra, of United States v. California & Oregon Land Co., is cited as sustaining this view. It is contended, therefore, that Senate Joint Resolution No. 54 (43 Stat. 5), "directed the appointment of special counsel to handle certain specific matters, the laws relating to the functions of the Attorney General to the contrary notwithstanding." Counsel further say: "Prior to the passage of Senate Joint Resolution No. 54 on February 8, 1924, the Attorney General no doubt had authority to institute proceedings for the cancellation of all leases and contracts involved in this case. * * * The only fair construction which can be placed upon this Joint Resolution is that the Congress decided to leave the litigation as to other leases, if any was advisable, under the control of the Department of Justice."

One difficulty with this contention is that, while the bill of complaint in the first Pan-American Case recites that it is brought by the United States, appearing by special counsel appointed by the President, the bill is signed, not only by special counsel, but also by the United States District Attorney for the Southern District of California as "Solicitors for Plaintiff." While special counsel controlled the prosecution of the case, it appears throughout the record in all the courts, excepting the Supreme Court, that the United States District Attorney was associated with special counsel.

While provision is made in Joint Resolution No. 54 for the appointment of "special counsel who shall have charge and control of the prosecution of such litigation, anything in the statutes touching the powers of the Attorney General of the Department of Justice to the contrary notwithstanding," it does not appear therefrom that Congress was establishing any matter of court procedure varying from the general rules. While the resolution required the institution and prosecution of suit "for the annulment and cancellation of the said leases and contract (theretofore specifically referred to) and all contracts incidental or supplemental thereto," it further provided: "To secure any further appropriate incidental relief, and to prosecute such other actions or proceedings, civil and criminal, as may be warranted by the facts in relation to the making of the said leases and contracts."

It is clear that any other leases affected by the same fraud would come within the provision "to secure any further appropriate incidental relief." Especially would that be true when at the very least a question would exist whether any such further relief by way of setting aside other leases could be had under the rule against splitting causes of action.

It cannot be said as a matter of law, as contended by counsel for the plaintiff, that "the authority of the special counsel conducting the former suit was expressly limited by Senate Joint Resolution No. 54, under which they were appointed, to the conducting of litigation with respect to the two contracts and two leases set aside in the former suit." Even if the expression "further appropriate incidental relief" might under a very strict construction be said to relate only to a form of relief in addition to injunctive relief theretofore in the resolution immediately referred to, the provision is clear that special counsel could prosecute "other actions." In the adoption of the resolution, it is manifest that Congress had a definite purpose, and that was to provide for all necessary court proceedings to accomplish the object specified. To hold that Congress intended that two or more suits should be brought where only one was necessary would do violence to the intent of Congress as expressed in the resolution.

In the brief of counsel for plaintiff appears the following, among a number of similar expressions: "The leases involved in this suit are so interwoven with the transaction that resulted in the contracts and leases involved in the former suit that these leases and

the making of them was a part of the same single transaction. But it was an evidentiary transaction and not the case of action in the former suit and it was an evidentiary transaction as involved in this suit."

Counsel for plaintiff also say: "The causes of action in this suit are the result of the same conspiracy alleged in the former suit and also of subsidiary conspiracies."

As heretofore held, in so far as the leases or any of them involved in this suit are the result of the same fraud or conspiracy alleged in the former suit, they are a part of the single cause of action effected by such fraud or conspiracy.

It is the conclusion of the court that there is nothing in the language of Resolution No. 54 which modifies the procedural rules inhibiting splitting of causes of action, or which prevented the inclusion of any of the leases here in question within the cause of action alleged in the former suit based on fraud or conspiracy.

For the reasons stated, plaintiff is not entitled to a decree or any relief as prayed for, and the amended bill of complaint should be dismissed. It is so ordered.

The court reserves the right to make and file findings of fact and conclusions of law, formal decree, and to make such other orders and take such further action as may be necessary or appropriate in the premises.