## GOULD PAPER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22356.   Promulgated June 30, 1932.

*George E. H. Goodner, Esq.*, and *Frederick C. Rohwerder, C. P. A.*, for the petitioner.

*H. A. Cox, Esq.*, for the respondent.

OPINION.

TRAMMELL: The petitioner contends that in determining its tax-able net income for 1917, 1918 and 1919 the respondent has errone-ously understated the depletion allowance to which it is entitled for those years. There is no controversy between the parties as to the quantity or number of cords of pulpwood timber ten inches or more in diameter standing on the petitioner's Tug Hill and Moose River tracts on March 1, 1913. They are, however, in disagreement as to the fair market value per cord of such timber on that date. In amended income-tax returns for the taxable years before us the petitioner, on the timber used, took depletion on the basis of a fair market value of $4.75 per cord on March 1, 1913. In its Form T filed with the respondent, the petitioner stated that it believed that amount was a " conservative average estimate " of the fair market value of its timber on the basic date. In determining the deficiencies here involved the respondent, for depletion purposes, determined that the fair market value of the timber on the basic date was $3.50 per cord. However, due to a misunderstanding as to the number of cords on which the petitioner had claimed depletion, the amount of depletion actually allowed on the number of cords used was, for 1917 and 1918, at values below $3.50 per cord, and for 1919 at a value in excess of that amount.

In its petition the petitioner alleges that the fair market value of its pulpwood timber on the basic date was not less than $4.75 per cord. However, in its brief it asks that we find such value on that date to be from $5.50 to $6 per cord. The respondent contends that the value was not in excess of $3.50 per cord.

In support of value of $4.75 per cord as alleged in the petition and the higher value contended for in its brief, the petitioner sub-mitted evidence indicating a value of $6.23 computed on a " back-to-the-stump " method. Under this method the petitioner takes the average price for 1913 of $11.58 per cord for Canadian pulpwood delivered in the Watertown District and subtracts therefrom the

average cost of $5.35 per cord for the five-year period 1910 to 1914 of cutting, preparing and delivering logs from its Tug Hill and Moose River tracts to its mills in the same condition as the Canadian wood was delivered, thereby arriving at an amount of $6.23 per cord. In this computation no allowance is made for burdens inherent in the ownership of property of this character, such as taxes, insurance and losses from fire, insects, wind and storms. The petitioner offered no evidence as to what would be a fair and reasonable allowance for such purposes, but sought to dispose of this point by submitting testimony to the effect that the growth of the timber would be sufficient to provide for these items. The evidence in the case was that the petitioner's timber was very largely virgin and that such timber would grow very little. The petitioner urges that a further element to be considered in connection with the " back-to-the-stump " value of $6.23 is that pulpwood from the Adirondacks is worth $1 per cord more than Canadian wood. Conceding that to be true, since there is testimony to support it, it is to be observed that the selling price of Canadian wood in the Watertown District included an element of profit to the Canadian producer. No allowance for selling expenses and profit is made in the petitioner's computation under its " back-to-the-stump " method. It is hardly reasonable to conclude that an intelligent purchaser would pay for property as great an amount as that which he could reasonably expect to realize from resale of it over a period of years.

The petitioner submitted testimony of four witnesses, three of whom expressed the opinion that the timber had a fair market value of $6 on the basic date. Their testimony shows that their opinions were based on a " back-to-the-stump " method as outlined above. The fourth witness testified to a value in 1913 of $5.50 per cord for the timber acquired by the petitioner in township 4 in 1907, stating that the value was about the same on both dates. This witness was also a witness in the proceedings by which the State of New York acquired the Taggarts Paper Company's timber lands, which compared favorably to the petitioner's Moose River tract from the standpoint of quality of timber and logging conditions. In 1916 he testified in that proceeding that in 1908–1909 " The Taggart wood at that time would be worth as much as any wood that you could find " and that it was worth from $3 to $3.50 a cord. When confronted in the instant case with the apparent conflict in his testimony as to value in the *Taggarts* case and in the instant case he at first had no recollection of testifying in the *Taggarts* case, or of what tract was involved. Later he was able to recall the details of the case and stated that the decision of the court in that case as to the value of the timber involved had since caused him to change his opinion upward with respect to the value of timber in that region.

When it is observed that the court found a value for pulpwood of only $4.25 a cord in the *Taggarts* case, it is difficult to understand how this witness could revise his opinion upward to such an extent as to think that the timber had a value of almost twice that testified to by him in 1916.

In further support of its contention that the respondent has determined too low a value for its timber on March 1, 1913, the petitioner relies on the decision of the Court of Claims of the State of New York in the *Taggarts* case, which according to the record in the instant case was rendered after a very exhaustive hearing. Although giving full consideration to that decision, we do not think it should be accepted as controlling here, since, with the exception of the instance referred to above, we do not know what the testimony was in that case. The instant case must be decided on the basis of the record made in it.

In support of his determination of a fair market value of $3.50 per cord on March 1, 1913, the respondent submitted the testimony of three witnesses. One of these was of the opinion that the timber on the two tracts had a fair market value on March 1, 1913, of from $2.50 to $3 per cord. Another was of the opinion that the timber on the two tracts had a value of $3 a cord on that date, while the third witness was of the opinion that the value of the timber on the Moose River tract on the basic date was $3 a cord.

Giving due consideration to all the evidence on this point, we are unable to find that the fair market value on March 1, 1913, of the petitioner's softwood timber ten inches and over in diameter on its two tracts was in excess of $3.50 per cord, the amount determined by the respondent. This rate should be applied to the timber used by the petitioner during the taxable years instead of the timber cut. *Clearfield Lumber Co.*, 3 B. T. A. 1282.

The petitioner contends that the respondent erred in disallowing a deduction for 1918 of $2,916.21 taken by it as representing a repayment made in that year to the Adirondack League Club on account of excess interest credits erroneously allowed to the petitioner in 1916 and 1917 under the circumstances set out in our findings of fact. The respondent denies that his action was erroneous. Over a period of years the petitioner was a purchaser of timber from the Adirondack League Club. Under the contracts of purchase the petitioner advanced money to the Club from time to time. Such advances drew interest until the wood was removed by the petitioner. In 1916 and 1917, in adjusting the accounts between itself and the petitioner, the Club allowed the petitioner credit for interest in the amount of $2,916.21 in excess of the amount to which the petitioner was entitled. The record does not disclose for what years such excessive interest was allowed or what amount was allowed in 1916 and what amount

in 1917, nor does it disclose whether the same error was made in accruing the interest on the petitioner's books and reporting it as income as was made by the Club in allowing it. For all the record discloses the petitioner may have accrued the correct amount on its books in the years prior to the taxable year. If any amount had been received as interest in addition to what was properly accrued or accruable in those years, the record does not disclose how it was reported or treated in its return.

Where a taxpayer is on the accrual basis, as was the petitioner, interest receivable accrues ratably, and is properly reportable as income for the year or years in which it accrues. The date of receipt is immaterial. Cf. *J. B. Jemison*, 18 B. T. A. 399; *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566. If during 1916 and 1917 or prior years the petitioner erroneously accrued on its books greater amounts of interest than it was entitled to, or if during those years it accrued only the correct amounts of interest but actually collected amounts in excess of those to which it was entitled and reported the excess as income, the proper return or returns in which to make adjustment of the error are the returns for the year or years in which the error was made and not in the return for 1918, the year in which repayment was made. A taxpayer may not erroneously overstate its income for one or more years and then correct the error by taking deductions therefor in its return for a subsequent year. The action of the respondent is sustained as to this issue.

The petitioner contends that the respondent erred in disallowing as deductions for 1917, 1918 and 1919 the amounts of $6,348.25, $12,750 and $16,173, respectively, representing advances made to the Glendale and Western Railroad Company under an agreement whereby the petitioner and the holder of the other half of the stock of that company were to advance to that company, equally as between themselves, amounts sufficient to meet the excess of the road's expenses over its revenues. The petitioner urges that the amounts thus advanced are deductible as operating expenses to it and that they constituted part of the cost of getting its logs from its Tug Hill tract to its mill. The respondent contends that the amounts are not so deductible, but represent loans made by the petitioner to the railroad company.

In support of its contention the petitioner submitted the testimony of its president and treasurer, H. P. Gould, who testified among other things to the advances and the agreement under which they were made. He also testified that the amounts advanced by the petitioner were carried on its books as indebtedness owing to it by the railroad company. No attempt was made in his testimony to reconcile such action with the contention now advanced by the petitioner.

The amounts in controversy were carried by the petitioner on its books as assets, were shown as such by the petitioner in its various tax returns, and were determined to be such by the respondent in determining the deficiencies here involved. No explanation is offered by the petitioner as to why, if the amounts actually constituted operating expenses, it so consistently treated them as assets. In our opinion the evidence fails to sustain the petitioner's contention. The determination of the respondent is sustained on this issue.

In determining the petitioner's invested capital for the years here involved the respondent determined the petitioner's reserve for depreciation at March 1, 1913, to be $206,098.33, or the total of the amounts entered by the petitioner on its books for depreciation for 1909, 1911 and 1912 and for two-twelfths of 1913. Such amounts were taken as deductions by the petitioner in its returns of annual net income for the respective years and were allowed by the respondent.

The petitioner contends that the respondent has overstated the amount of the reserve for depreciation at March 1, 1913, and that the amount determined by the respondent should be reduced by $80,214.84. In support of this contention the petitioner submitted evidence showing that prior to March 1, 1913, it was its practice to charge to expense certain expenditures which under its present methods of accounting would be capitalized and that during the period between March 1, 1897, and March 1, 1913, it expended a total of $80,214.84 for replacements of and additions to depreciable assets which were charged to expense. The evidence also shows that no part of the $80,214.84 is included in the cost of depreciable assets at March 1, 1913, as determined by the respondent and that no depreciation deductions have been taken or allowed with respect to the items for which the amount was expended. The evidence however does not show what portion of the amount was for additions or what portion was for replacements. Nor does it show whether the assets that were replaced were retired from the petitioner's accounts as they were replaced or whether they were continued on the books. The evidence does not indicate whether the items for which the $80,214.84 was expended remained in use on and after March 1, 1913. Although the evidence shows the amounts of depreciation entered by the petitioner on its books for the period 1909, the first year for which depreciation was entered on the books, to March 1, 1913, we do not know what amount was sustained in years prior to 1909. From the evidence before us we are unable to find that the reserve for depreciation at March 1, 1913, as determined by the respondent should be reduced as the petitioner contends.

In an amended answer the respondent claims that the reserve for depreciation at March 1, 1913, of $206,098.33 as determined by him should be increased to $259,039.41, or by the amount of $52,941.08 representing depreciation deducted by the petitioner in its annual return of net income for 1910 but not entered by the petitioner on its books. The petitioner denies that the reserve should be so increased.

The amount of $259,039.41 as now contended for by the respondent represents the total amount of the deductions for depreciation taken by the petitioner in its returns for the period 1909 to March 1, 1913, and allowed by the respondent. With the exception of the amount of $80,214.84 expended by the petitioner for additions and replacements and considered by us above, the petitioner does not contend that the deductions taken and allowed were in excess of the amount of depreciation actually sustained prior to March 1, 1913. Nor does the record indicate that such was the case. No attempt was made by the petitioner to show what amount of depreciation had been actually sustained by it prior to March 1, 1913. It simply sought to offset or reduce a portion of that determined by the respondent by submitting evidence as to expenditures for additions and replacements, which we have held above was insufficient for that purpose. The petitioner having claimed in its returns and having been allowed deductions for depreciation in the amount of $259,039.41 for the period prior to March 1, 1913, and the evidence failing to show that such amount had not been sustained, we think that it should be considered to be the proper amount of the reserve for depreciation at March 1, 1913, for invested capital purposes. *W. T. & M. Co.*, 11 B. T. A. 722; *Moraine Hotel Co.*, 15 B. T. A. 910; affd., 41 Fed. (2d) 725.

In determining the petitioner's invested capital for each of the years here in controversy the respondent arrived at the cost of timber included therein by deducting from the petitioner's total cost depletion on the total amount of timber cut to the end of the preceding year, irrespective of the fact that the petitioner had several thousand cords of timber in the woods which had been cut but had not been removed or used. This cut, unremoved and unused timber was not taken into an inventory or asset account of any kind and consequently was excluded from invested capital.

The petitioner contends that the respondent erred in excluding such timber from invested capital. The petitioner urges that the timber should be included in invested capital at its fair market value on March 1, 1913, since depletion was sustained at the time the timber was cut, because at that time it was converted from a natural resource to an asset of another form. The respondent con-

cedes that he erred in excluding the timber from invested capital, but contends that it should be included therein at cost, since to include it at the fair market value on March 1, 1913, would result in including in invested capital unrealized appreciation on the timber which was still owned by the petitioner.

To grant the petitioner's contention would in effect be holding that invested capital may include a "marking up of the valuation of assets upon the books to correspond with increase in market value," a thing the Supreme Court in *La Belle Iron Works* v. *United States*, 256 U. S. 377, held could not be done. The cut but unremoved timber was excluded by the respondent from the petitioner's invested capital on the basis of cost. In view of the foregoing decision of the Supreme Court, we think it should be restored to invested capital on the same basis and not at its fair market value on March 1, 1913, as contended for by the petitioner.

In 1907 the petitioner, for 3,400 shares of its capital stock of a par value of $100 per share, acquired from the International Paper Company about 17,000 acres of timber lands in township 4 and the Kosterville property consisting of two ground wood-pulp mills, including buildings, equipment, etc., and two developed water-power sites which furnished the power for operating the mills. In amended returns for the years here involved the petitioner showed the value of those properties at the time of acquisition in 1907 to have been as follows: timber lands, $263,416.35; the two pulp mills, including buildings, equipment, etc., $84,420.47; and the two water-power sites, $91,192.08, or a total value of $439,028.90. In determining the petitioner's invested capital the respondent accepted the value shown by the petitioner for the timber lands, but determined the value of the two mills to have been $123,112.55 and the value of the two water-power sites to have been $52,500, or a total of $439,028.90, the same amount shown by the petitioner in its returns.

In its petition the petitioner alleges that the respondent erred in understating the value of the mill property, water-power rights and timber lands and alleges that the value of such property at the time of acquisition was at least $740,000. At the hearing and in its briefs the petitioner has accepted as correct the value of $123,112.55 determined by the respondent for the two ground wood-pulp mills, including buildings, equipment, etc. In its brief the petitioner contends that the actual cash value of the timber lands at the time of acquisition was $991,500 and that of the water-power sites was $329,060, or a total amount much in excess of that set forth in its petition. In accepting the determination of the respondent as to the value of the two mills and by contending for the foregoing amounts as values for the timber lands and water-power sites, the petitioner

is contending that for $340,000 par value of its capital stock it acquired assets having an actual cash value of $1,443,673.55 at the time of acquisition, or a value of $1,103,672.55 in excess of the par value of the stock issued therefor. The respondent denies that the timber lands and the water-power sites had the values contended for by the petitioner.

The amount of $991,500 contended for as representing the value of the timber lands is computed as follows: 271,000 cords of softwood ten inches and above in diameter at $3 per cord, $813,000; 17,000 acres of land with the hardwood timber and the softwood timber under ten inches in diameter standing thereon at $10.50 an acre, $178,500. The value of $10.50 an acre is composed of $5 an acre for the land, $5 for the softwood timber under ten inches in diameter ($2 a cord for 2½ cords to the acre) and 50 cents per thousand feet of hardwood timber to the acre.

There is no controversy between the parties as to the quantities of the different classes of timber acquired, but they are in disagreement as to the values of such timber as well as to the value of the land.

In support of the values contended for for the land and the timber the petitioner submitted the testimony of three witnesses. One of these, J. B. Todd, was of the opinion that the value of the softwood timber ten inches and above in diameter as well as that less than ten inches in diameter was $5.50 a cord in 1907. He placed a value on the hardwood of 50 cents per thousand feet. He valued the land with the softwood under ten inches and the hardwood thereon at $12 an acre. Since there were 2½ cords per acre of softwood under ten inches and 1,000 feet of hardwood per acre, the value of such softwood and hardwood per acre according to this witness was $14.25, or $2.25 an acre in excess of the value of $12 testified to by him as being the value of the land plus the small softwood and the hardwood. His valuations would indicate that he did not consider the land as having any value. Another witness, John E. Johnston, was of the opinion that the softwood timber ten inches and above in diameter had a value in 1907 of $3 per cord; that the softwood timber under ten inches had a value of $3 a cord when removed with the larger timber, or $2 a cord when left on the land; and that the hardwood timber had a value of 50 cents per thousand feet. He was of the opinion that the land with the hardwood and the softwood under ten inches had a value in 1907 of from $10 to $12 an acre. His valuations for the softwood timber under ten inches and the hardwood timber would indicate that he considered the land as having a value of from $2.50 to $6.50 an acre. Another witness, H. P. Gould, was of the opinion that the softwood timber ten inches and

above in diameter had a value of $3 a cord in 1907, and that the softwood timber under ten inches in diameter had a value of from $2 to $3 a cord. He was of the opinion that the land, the hardwood timber and the softwood timber had a value in 1907 of $10.50 an acre. The use of the value placed on the hardwood by the petitioner's other witnesses and the values placed by this witness on the softwood under ten inches indicate that this witness considered the land as having a value of from $3 to $5 an acre.

In support of his determination with respect to the land and timber the respondent submitted the testimony of a witness who placed a value of $1.50 per cord on the softwood timber eight inches and above in diameter. He was of the opinion that the land, the softwood timber less than eight inches in diameter, and the hardwood timber, had no value.

In 1904 or 1905 a tract of 5,000 acres of softwood timber lands adjoining the petitioner's Moose River tract was sold for $60,000, or at the rate of $12 an acre. The witness who testified to this sale stated that the timber standing on the tract sold in 1904 or 1905 was similar to that on the petitioner's 17,000-acre tract here being considered and that the timber on both tracts was good. While he did not testify directly to the number of cords on the 5,000-acre tract, he was of the opinion that there were eight cords of softwood eight inches and above in diameter per acre on the petitioner's tract in 1907, which, when considered with his testimony as to the similarity of the two tracts, would indicate that he was of the opinion that there were eight cords to the acre on the 5,000-acre tract. Without allowing any value for the land or for any hardwood timber that might have been on it, this would give a value of not more than $1.50 per cord for the softwood timber on the 5,000-acre tract that was sold in 1904 or 1905.

About 1906 there was a sale of about 20,000 acres of softwood timber lands situated near to and comparable to the petitioner's Tug Hill tract at $6 an acre. There were from nine to ten cords of softwood timber per acre on this land. Allowing no value whatever for the land or for any hardwood that might have been on it, gives a value of from 60 cents to 66⅔ cents per cord for the softwood timber.

While shortly after acquiring the 17,000 acres of timber lands the petitioner sold back to the International Paper Company 21,000 cords of softwood timber at $2.50 per cord, this was the price paid for the timber as and when it was cut over a period of several years and was not a price paid at the time of purchase. The International Paper Company was operating on the same side of the divide on which this timber was situated, and it was worth more to that com-

pany than to the petitioner, whose operations were on the opposite side of the divide.

Considering all of the evidence in the case, we are of the opinion that the 271,000 cords of softwood timber ten inches and above in diameter on the 17,000-acre tract when acquired by the petitioner in 1907 had an actual cash value of $2 per cord; that the 42,500 cords of softwood timber under 10 inches in diameter had the same value at that time; that the 17,000,000 feet of hardwood timber had an actual cash value at that time of 50 cents per thousand feet; and that the land had an actual cash value of $2.50 per acre on the same date, or a total of $678,000 for the land and the timber thereon.

The petitioner contends that the two developed water-power sites had an actual cash value of $329,060 at the time of acquisition in 1907. In support of its contention the petitioner submitted the testimony of a witness who testified to that value. He arrived at this value by multiplying the number of horsepower years of primary energy, 717, and of secondary energy, 1,729, available at the sites by $30 and $15 respectively, representing the average prices paper mills in the Black River District were paying for purchased electric power in 1907. This gives a total of $47,445 for both classes of power per year. By capitalizing the latter amount at 12½ per cent, which he considered a reasonable rate, he arrived at $379,560. From this amount he deducted $50,500, which he considered represented depreciable property such as dams, flumes and machinery, thereby arriving at $329,060 for the power sites.

We have heretofore held that the value of water-power sites may not be determined by capitalizing the estimated savings resulting from the use of water power instead of steam power or electricity. *Georgia Manufacturing Co.*, 5 B. T. A. 893; *M. S. Brooks & Sons*, 10 B. T. A. 510. To approve the method of valuation used by the petitioner's witness would require us to go a step further than we refused to go in the foregoing cases and to hold that the value of a water-power site can be determined by capitalizing an operating expense on the basis of the cost of electricity, which, so far as the record shows, might have been the most expensive kind of power that could have been used. While the evidence shows the price that paper mills paid for purchased electric power in 1907, it also shows that water power was used almost exclusively for grinding pulpwood. It also indicates that the use of electricity for that purpose would have been prohibitive from the standpoint of cost, since ground wood pulp was a cheap commodity which required a cheap form of power for its production.

The petitioner also relies on the sale of the power site by the St. Regis Paper Company to the Power Corporation of New York. As

this sale occurred at some undisclosed date subsequent to 1920, we are of the opinion that it is too far removed from 1907 to be of much help in determining the value of the petitioner's water-power sites at the time of acquisition.

The respondent submitted the testimony of two witnesses as to the value of the water-power sites in 1907. One of these was of the opinion that the sites had a value of $60,000 in 1907, while the other was of the opinion that the value was $69,000.

Considering all the evidence on this point, we are of the opinion that the water-power sites had at the time of acquisition in 1907 an actual cash value of $91,192.08, the amount shown by the petitioner in its returns.

In determining the deficiency for 1917 the respondent determined that the value of the buildings and equipment composing Mills A and B was $123,112.55. This amount was accepted by the petitioner. We have determined that the actual cash value of the timber lands when acquired in 1907 was $627,000 and the value of the water-power sites was $91,192.08. The total of the values thus determined for the three groups of assets is $841,304.63. The respondent contends in his brief that, since these assets were acquired by the petitioner for $340,000 par value of its capital stock, they may not, under the limitations contained in section 207 (a) (2) of the Revenue Act of 1917, be included in petitioner's invested capital for that year at any amount in excess of the amount of the par value of the stock issued therefor.

The pertinent portions of section 207 of the Revenue Act of 1917 are as follows:

That as used in this title, the term "invested capital" for any year means * * . *

\* \* \* \* \* \* \* \*

(a) In the case of a corporation or partnership: (1) Actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment (but in case such tangible property was paid in prior to January first, nineteen hundred and fourteen, the actual cash value of such property as of January first, nineteen hundred and fourteen, but in no case to exceed the par value of the original stock or shares specifically issued therefor), and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year.

Inasmuch as the respondent in determining the deficiency for 1917 allowed the assets in the petitioner's invested capital at a total value of $439,028.90, which is in excess of the amount of $340,000, the par value of the stock issued for the assets, the import of his contention, if granted, is to increase the deficiency without his having moved with respect to this point either at or before the hearing. To this extent his contention presents an issue not raised by the pleadings.

We think it is sufficient, however, to say that the question presented by his contention has heretofore been decided adversely to him in our decisions in *St. Louis Screw Co.*, 2 B. T. A. 649, and *Mandel Brothers*, 4 B. T. A. 341.

While the petitioner did not submit any evidence directed to the actual cash value on January 1, 1914, of the timber lands and water-power sites acquired in 1907, the evidence shows that the value of properties of those classes gradually increased in years subsequent to 1907. Subject to adjustment for depletion resulting from the sale or use of timber from the timber lands, we conclude that the value on January 1, 1914, was not any less than that at the time of acquisition. For 1917, 1918 and 1919 the petitioner is therefore entitled to include the timber lands and water-power sites in its invested capital at their actual cash values at the time of acquisition as determined by us, subject to the adjustment indicated in the preceding sentence. The buildings and machinery (Mills A and B) remain in invested capital at the value determined by the respondent, since no controversy exists with respect to them.

The remaining issue relates to the deductibility of an amount of $26,210.98 deducted by the petitioner in its return for 1917 for legal expenses incurred and paid in that year. In determining the deficiency for 1917 the respondent allowed the deduction, but in an amended answer alleges that he erred in doing so and asks that we hold that the amount is not deductible and that the deficiency should be increased accordingly. The respondent contends that the amount was expended by the petitioner in defending itself, its then president, and the News Print Manufacturers Association, of which the petitioner and its president were members, in litigation prosecuted by the United States for violation of the antitrust laws. The petitioner contends that the amount was expended in defending its president in the criminal proceeding with respect to which the indictment was dismissed on motion of the prosecution and that the petitioner's president, thus not having been convicted of a criminal offense, the amount is allowable as a deduction.

The evidence shows that prior to the time any legal proceedings were instituted against the petitioner or its president, its president employed Henry A. Wise to represent the petitioner and its interests. Thereafter the petitioner's then president, along with others, was indicted, being charged with unlawfully having engaged in a conspiracy in restraint of trade and commerce. The trial of the defendants was begun on November 15, 1917, but was adjourned to November 26, 1917, at which time certain of the defendants changed their pleas to *nolo contendere*, but as to the petitioner's president the indictment was dismissed on motion of counsel for the Government.

Prior to the beginning of the trial certain negotiations were begun between attorneys for the Government and representatives of certain of the corporations whose officers had been indicted. These negotiations resulted in an agreement dated November 26, 1917, between the Attorney General and the manufacturers, the pertinent parts of which are mentioned in our findings of fact. Wise, as attorney for the petitioner, participated in the preparation of the agreement and signed it for the petitioner. Pursuant to this agreement the Attorney General, on November 26, 1917, instituted a proceeding in equity against those individuals who were defendants in the criminal proceeding, including the petitioner's then president, and against certain corporations, among which were the petitioner, alleging that such individuals and corporations had engaged in the restraint of trade and commerce contrary to the law of the United States and asking, among other things, that the court find that they had so done as alleged and that the court enjoin them from further doing so. Wise appeared as counsel for the petitioner and its then president in this proceeding and attended to the framing of the final decree. This decree recites that it was entered upon the consents thereto in writing and in open court by the defendants in that proceeding, including the petitioner and its president, and that said consents were duly given by their respective solicitors to the entry thereof before any testimony was taken. The court, as set forth in the decree, found among other things that the defendants by becoming and acting as members of the News Print Manufacturers Association had entered into and engaged in an unlawful combination in restraint of trade and commerce in newsprint paper, in violation of the Act of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," and enjoined them against a continuation thereof. From the evidence before us we think that the legal expenses incurred by the petitioner were for services rendered not only in behalf of its president in the criminal proceedings, but also in behalf of it and its president in the equity proceeding, and we have so found as a fact. While the indictment in the criminal proceeding was dismissed on motion of the Government, in the equity proceeding the court found, upon the written consents of the petitioner and its president, duly given by their counsel, in open court, that they had engaged in an unlawful combination in restraint of trade. Whatever may have been the reason of the prosecuting officer of the Government in moving the dismissal of the indictment, the petitioner and its president in the equity proceeding consented to the court entering a decree finding that they had violated the antitrust laws of the United States because of their

connection with the News Print Manufacturers Association, the same connection on which the indictment of the petitioner's president was based.

To be deductible the amount of legal expenses here involved must constitute ordinary and necessary expenses incurred by the petitioner in the maintenance and operation of its business and properties. These expenditures were incurred in connection with criminal proceedings against the petitioner's president and equitable proceedings against him and the petitioner. These proceedings resulted from the parties having been members of and having participated in the activities of the News Print Manufacturers Association, which organization was an unlawful combination of the petitioner, its president, and others in the restraint of trade and in violation of a Federal statute. This being true, we do not think that the legal expenses resulted proximately from the maintenance and operation of the petitioner's business and properties. Consequently, they do not constitute an allowable deduction in determining the petitioner's net income. See *Atlantic Terra Cotta Co.*, 13 B. T. A. 1289; *Sanitary Earthenware Specialty Co.*, 19 B. T. A. 641; *Burroughs Building Material Co.* v. *Commissioner*, 47 Fed. (2d) 178, affirming 18 B. T. A. 101.

*Judgment will be entered under Rule 50.*