### BLUM v. HELVERING, Com'r of Internal Revenue.

### ALSTRIN v. SAME.

### STEIN v. SAME (two cases).
### Nos. 6236–6239.

United States Court of Appeals for the District of Columbia.

Argued Nov. 12, 1934.

Decided Dec. 3, 1934.

Preston B. Kavanagh, of Washington, D. C., and S. Sidney Stein, of Chicago, Ill., for petitioners.

Frank J. Wideman, Sewall Key, Robert H. Jackson, Chester A. Gwinn, and J. P. Jackson, all of Washington, D. C., for respondent.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, and GRONER, Associate Justices.

GRONER, Associate Justice.

Petitioners, partners under the name of Stein, Alstrin & Co., were engaged in the stock and bond brokerage business, and were members of the New York and Chicago Stock Exchanges. On September 23, 1924, a preliminary underwriting agreement was entered into between themselves, as bankers, and Sidney C. Anschell, as owner of substantially all of the capital stock of Universal Theaters Concession Company. The contract contemplated that petitioners would investigate the legal, financial, and physical conditions of the company, and, if found satisfactory, would notify Anschell, who would then cause the corporation to be reorganized and would cause to be sold to petitioners 40,000 shares of class A stock at $20 for each share. The investigation was made, and presumably the report was satisfactory, for on October 7, 1924, the preliminary agreement was merged into two contracts. The first of these provided that the reorganized corporation would sell, and petitioners would buy, 40,000 shares of class A stock at the agreed price, conditioned only that petitioners should satisfy themselves that they would succeed in having the shares of stock regularly listed on the Chicago Stock Exchange. The second recited that, in order to facilitate an open market for the shares of stock to be purchased, Anschell as seller would contribute $50,000 to the capital of a six months' trading account or pool to be conducted through petitioners. Petitioners, likewise to promote and facilitate the operations of the pool, agreed to contribute thereto so much money as should in their opinion be necessary, not to exceed, however, a like sum of $50,000. The profits of the trading account were to go half and half to Anschell and petitioners, and the loss, if any, to be divided equally. The stock was listed and admitted to trading on the stock exchange as of November 7, 1924, but prior to that date petitioners had paid for and taken over the 40,000 shares of stock, which in turn they had sold to their customers at a profit to themselves of $280,209.21.

In computing the distributable income of the partnership for the year 1924, the Commissioner included the sum of $280,209.21, and in computing the taxable net income of each of the petitioners he included the proportionate share of the profits of this transaction which each petitioner, under the partnership articles, was entitled to and did receive. Petitioners contend the Commissioner was wrong, because the transaction was not completed in 1924 so as to be taxable as to profits in that year. They tell us that, under the agreement by which they sold and distributed the stock to their numerous customers, there was an agreement that the stock would be listed on the exchange and that under the rules of the exchange no new stock could be listed until satisfactory arrangements were made to insure free and open trading in the market. Therefore they say that the trading pool or syndicate which they agreed to operate and support demanded and required a secondary distribution of the stock, and that in the performance of this service, which was obligatory on them as a part of their original contract of purchase, and likewise impliedly as a part of their contracts of sale, they sustained a loss in 1925 of $434,173.

Summarized, the argument is: First, that petitioners would not have purchased the 40,000 shares of stock if the same had not been listed and admitted to trading on the Chicago Stock Exchange; second, that the stock exchange would have refused to list the stock unless assured that proper arrangements had been made to insure a market for the sale of the stock when holders desired to sell and a reasonable offering of stock when purchasers desired to buy; and, third, that petitioners' purchasers, i. e., their customers, would not have purchased any of the stock except for petitioners' undertaking to have the stock listed on the exchange. From all of this petitioners argue that their purchase and sale of the shares of stock in question imposed on them the binding obligation to sustain and support the market for the stock for a reasonable period after listing, and that until this obligation was discharged the transaction was uncompleted and the result as to profit or loss undetermined.

As we have seen, petitioners lost $434,173 in maintaining a market for the stock in the years 1924 and 1925; and as this amount is more than $150,000 in excess of the profit from the first distribution of the stock,

they say there was a net loss and not a net gain and, therefore, the imposition of the tax is wrong. The Board held that the sales of stock made by petitioners in 1924 were completed and closed in 1924; that title to the stock passed and payment therefor was made; that the partnership was under no legal obligation to its customers to buy this stock back at any time or at any price; and that the partnership's participation in the syndicate formed to trade in the stock and the resulting loss did not prevent the gain received in the previous year from being taxable in that year. We think the Board was right. The undisputed facts show that petitioners bought the 40,000 shares of stock in 1924 and thereafter, in that same year, sold them, and a profit resulted. It is quite true there was an obligation on petitioners' part to list the stock, for they had represented to their purchasers it would be listed. And it may very well be that except for this promise they never could have sold the stock; but the listing being had, there certainly was no ground on which the original purchasers from petitioners could have maintained an action to rescind the sales and recover the purchase price. As between petitioners and their customers, the transaction was closed, and the only obligation left was to the original seller, as a result of which petitioners were committed to manage a pool for six months, and for which they were to furnish a fund not to exceed $50,000. But this, we are told, is called a secondary distribution, and by the customary practice employed by bankers is to be regarded as part and parcel of the original transaction.

The reason of this is doubtless that a prudent banker, having regard to a contingent liability arising out of a transaction, may choose to regard the transaction as an open one until the contingency has passed, but this is not the test in determining liability for taxes. Deductions in a particular year are allowable only where the liability for which they are claimed is fixed and absolute. The Supreme Court has held over and over again that a taxpayer may not postpone the payment of the tax then due, in order to ascertain whether the final outcome of the transaction out of which the taxable profit accrued would ultimately result in a gain or a loss. Nothing is now better established than that the assessment of income taxes is on the basis of an annual accounting period, and while, as the Supreme Court has said, conceivably a different system might be devised by which the tax could be assessed wholly or in part on the basis of the finally ascertained result, Congress is not required to, and has not adopted such a system. Burnet v. Sanford & Brooks Co., 282 U. S. 359, 365, 51 S. Ct. 150, 75 L. Ed. 383. Hence it is now the settled law that if a taxpayer derives a profit without any restriction as to its disposition, he has received income and is required to return it in the year when received, even though it may still be claimed he is not entitled to retain the money and even though he may be ultimately adjudged liable to restore its equivalent. North A. Oil Consolidated v. Burnet, 286 U. S. 417, 424, 52 S. Ct. 613, 76 L. Ed. 1197. That is a more far-reaching statement of the rule than is necessary to a denial of the petitioners' claim in this case, because here in 1924, when the profit from the sale and distribution of the 40,000 shares of stock was received by petitioners, there was no way of knowing whether the operation of the trading pool would finally result in profit or in loss. There was, therefore, no pending claim against it in 1924, but only, at most, an obligation in which the factor of chance or turn of the market might create a gain or—just as well—a loss. Moreover, the manner and method of conducting the trading operations, as well as the extent of such operations, were within the discretion of petitioners, except that they were to continue for a period of six months, and involve the risk of $50,000. As it turns out, the trading operations were continued longer than six months and involved a greater loss than $50,000, all of which shows that in 1924 the ultimate results of the operations were wholly uncertain. If the payment of the tax can be postponed to include the transactions occurring in the entire year 1925, it might likewise be postponed for still another year, and so on indefinitely, and it was just to avoid these contingencies that the rule making the taxable year the limit was adopted. There may be cases in which the rule works hardship on the taxpayer, but the reason of the rule is the necessity of government, and so firmly is it established and confirmed by decisions of the Supreme Court that, as we view the matter, it would be merely a waste of time to discuss it further. See Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S. Ct. 150, 75 L. Ed. 383; Brown v. Helvering, 291 U. S. 193, 54 S. Ct. 356, 78 L. Ed. 725; Lucas v. Code Co., 280 U. S. 445, 50 S. Ct. 202, 74 L. Ed. 538, 67 A. L. R. 1010; North American Oil Consolidated v. Burnet, 286 U. S. 417, 52 S. Ct. 613, 76 L. Ed. 1197; Weiss v. Wiener, 279

U. S. 333, 335, 49 S. Ct. 337, 73 L. Ed. 720; Lewellyn v. Electric Co., 275 U. S. 243, 48 S. Ct. 63, 72 L. Ed. 262.

Affirmed.