## McDUFFIE v. UNITED STATES.

No. 42552.

Court of Claims.
May 3, 1937.

Joseph D. Peeler, of Los Angeles, Cal. (Gibson, Dunn & Crutcher and Miller & Chevalier, all of Los Angeles, Cal., on the brief), for plaintiff.

Henry A. Cox, of Washington, D. C., and James W. Morris, Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

BOOTH, Chief Justice.

This tax suit is brought by the receiver of the Pan American Petroleum Company, a California corporation, for an alleged overpayment of income taxes for the calendar year 1925. The facts involved have been stipulated, thereby reducing the issues to be adjudicated to two distinct ones.

The plaintiff is engaged in the production and transportation of crude oil, and this controversy arises out of its activities with respect to this commodity. Plaintiff's and its parent company's consolidated tax return for the calendar year 1925 disclosed plaintiff's tax liability to be the sum of $416,654.20, and this total sum was paid by plaintiff in quarterly installments during the year 1926. Thereafter on January 5, 1928, March 6, 1929, and March 20, 1933, plaintiff filed three claims for the refund of alleged overpayments of taxes for 1925, the final one seeking the refund of the total tax paid for 1925. It is conceded that these claims were filed in time and meet the law and regulations of the Bureau of Internal Revenue.

On September 22, 1933, the Commissioner of Internal Revenue issued to plaintiff a certificate of overassessment for the year 1925 for the sum of $22,379.79, and on October 7, 1933, rejected all the above refund claims to the extent of $394,274.41. The sum of $22,379.79 was an overpayment and was credited upon an outstanding judgment against the plaintiff in favor of the United States.

The first item in suit grows out of the following facts: Plaintiff during the calendar year 1925 incurred incidental expenses represented in wages paid, money expended for repairs, fuel, and hauling in connection with its development and operation of oil leases, to the extent of $1,007,493.50. Plaintiff originally capitalized these expenditures. June 18, 1927, the following Treasury Decision, known as T. D. 4025, was approved:

"Under the provisions of Article 223, Regulations 69, such incidental expenses as are paid for wages, fuel, repairs, hauling, etc., in connection with the exploration of oil and gas property, drilling of wells, building of pipe lines, and development of such property may at the option of the taxpayer be deducted as a development expense or charged to capital account. The regulations promulgated under the Revenue Acts of 1918, 1921, and 1924 provide for the same option.

"In view of the change in the basis for depletion provided in the Revenue Act of 1926, in the case of oil and gas wells, taxpayers may make a new election as to the treatment of the expenditures above mentioned for taxable periods beginning on or after January 1, 1925, but not later than six months after the date of this decision. Taxpayers desiring to make a new election are required to file amended returns for the taxable periods involved within six months from the date of this decision."

December 16, 1927, plaintiff complied with the provisions of T.D. 4025, filed an amended return for 1925 and claimed as a deduction the above exploration expenses, and the Commissioner thereafter allowed the claim in full. What plaintiff now complains of is the fact that after the Commissioner allowed the full amount of stated intangible expenses as a deduction, he made an offsetting adjustment of plaintiff's tax liability by treating part of said intangible

expenses as part of the cost of products held in plaintiff's closing inventory for 1925, thereby increasing plaintiff's taxable net income for 1925 in the sum of $522,-391.37.

As stated in the findings, "in determining the amount of this adjustment the Commissioner applied a rate of 21.73 percent as the relation which transfers of oil from leases bore to total transfers and purchases of oil. However, both parties hereto agree that the correct rate to be applied is 17.675 percent." In the event the basis followed by the Commissioner in determining the cost of the closing inventory is approved, the effect of the stipulation would be to reduce the closing inventory by the difference between $522,391.37, the adjustment made by the Commissioner on the basis of a rate of 21.73 per cent., and $459,885.31, the adjustment based upon the rate of 17.675 per cent. now agreed upon.

What the Commissioner did in determining the plaintiff's inventory adjustment was to ascertain the cost of plaintiff's oil on hand at the close of the year 1925 by treating as a part thereof the intangible development costs incurred on the properties in 1925 and allowed as an expense under plaintiff's election. These costs comprised expenses incurred on wells as follows: (1) Expenses incurred after production commenced on wells that produced during the year; (2) expenses incurred before production (but during the year) on wells that produced during the year; and (3) expenses during the year on wells that did not produce during the year, but which were located on the producing property.

The plaintiff concedes that a pro rata proportion of intangible expenses incurred during the period of production is properly allocated to inventory costs of oil on hand at the end of the year, so that what remains of plaintiff's challenge to the Commissioner's action is confined to the second and third factors resorted to by the Commissioner in valuing plaintiff's closing inventory for the year 1925.

The Commissioner under the regulations treated the oil leasehold as a unit, and manifestly as thus segregated the oil deposit, if any, obtained from exploration of the leasehold involves the process of drilling wells, some of which may produce and others may be nonproductive. Nevertheless the expense involved in the exploration of the property becomes pro rata a part of the cost of oil obtained from the same and on hand at the close of the taxable year.

It is true the plaintiff possessed an option either to deduct intangible costs as operating expenses or capitalize them returnable through depletion. The issue we have is whether the exercise of this option precludes the Commissioner in the ascertainment of inventory values from resorting in part to this class of expenses as a part of the cost of the product on hand at the close of the year. That it does not is admitted by plaintiff as to producing wells, and the Commissioner resorts to the disputed items only when the nonproductive wells are located upon a leasehold (property) that did produce oil during the taxable year.

The plaintiff's argument as we apprehend it centers cost of the product upon precisely the same items employed by the Commissioner, but limits the computation to individual producing wells rather than to the unitary character of the transaction.

If "A" leases from "B" a 160-acre tract of land for the purpose of drilling for oil, and "A" drills twenty wells thereon, ten of which produce oil and ten of which are nonproductive, then it is apparent that if the leasehold yields 10,000 barrels of oil within the year the pro rata expense of the exploration for that period enters into the cost of the oil produced, and inventory values are to be stated in accord with the provision of the revenue act authorizing the same.

The above illustration may, we think, be applied to intangible development expenses incurred with respect to wells drilled upon a leasehold prior to production. When the wells so drilled come into production, the result is precisely similar. The product resulting from the operation of the leasehold is burdened with the pro rata cost of the expense involved in the exploration of the property.

The plaintiff, possessing the option either to deduct the intangible development expenses or capitalize them, elected to take the course of deducting them, and, by so doing, whatever advantages attached thereto accrued. Nevertheless, if some of the items so deducted inevitably enter into the cost of the product, good accounting practice exacts the action of the Commissioner in this case.

True, in some instances the exercise of the option noted may not result advantageously to the taxpayer. That, however, is a matter to be anticipated in the exercise of the right. Plaintiff by capitalizing the expenses here involved could have obtained whatever advantages accrue from the same, but by pursuing the opposite course he obtained and indispensably made the items proper in determining the cost of the product on hand at the close of the taxable year. The Commissioner was charged with the duty of determining the cost of the oil inventoried, and the expenditures which enter into cost were to be ascertained from the character of the enterprise, applying to it good accounting practice.

In addition to what has been said, the defendant urges with appropriate force that plaintiff has failed to establish by the burden of proof that the Commissioner's action with respect to the above contention was arbitrary or capricious. In Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 50 S.Ct. 263, 74 L.Ed. 848, a case involving section 203 of the Revenue Act of 1918 (40 Stat. 1060), the Supreme Court held (syllabus, 281 U.S. page 265):

"A taxpayer appealing from an order of the Board of Tax Appeals sustaining an increased income tax resulting from changes made by the Commissioner in the taxpayer's inventory, has the burden of proving that the Commissioner's action was plainly arbitrary.":

See, also, Swift Mfg. Co. v. United States (Ct.Cl.) 12 F.Supp. 453.

The mere pointing out of alleged inconsistencies and sporadic instances of alleged inequities does not meet the degree of proof essential to establish arbitrary action upon the part of the Commissioner, where the revenue law confers the measure of discretion it does confer upon the Commissioner with reference to the use of inventories in order to determine the income of a taxpayer. Justification for a holding adverse to plaintiff's contention is, we think, legally fortified by quoting section 205 of the Revenue Act of 1926, 44 Stat. 16, as follows:

"Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

It follows that the action of the Commissioner in adjusting plaintiff's closing inventory for 1925 must be sustained, except that the adjustment should be $459,885.31 instead of $522,391.37, as heretofore stated.

The principal and vital issue in the case arises from the facts appearing in findings 10, 11, and 12. If plaintiff's position with regard to this issue is invulnerable, the entire income tax paid by it for the year 1925, so far as it relates to the leases mentioned, is recoverable. On December 14, 1921, February 8, 1922, and July 28, 1922, what are known and designated as Crampton leases E, G, and I were entered into between Albert B. Fall, Secretary of the Interior, purporting to act for and on behalf of the United States, and the plaintiff.

Each lease covered described oil and gas properties of the United States known as portions of the United States Naval oil reserve, and during the calendar year 1925 the plaintiff received and included in its tax return from the leases an income of $674,089.38, which sum was included in reaching its net taxable income from the leases. All of plaintiff's net income from this source upon which it paid the income tax due was subsequently included in a money judgment obtained by the United States against the plaintiff.

February 8, 1924, Congress by a Joint Resolution (43 Stat. 5) approved on that date denounced the proceedings which resulted in the execution of the leases and authorized the President by and with the consent and approval of the Senate to employ special counsel and commence legal proceedings to cancel the leases and restore the properties to the United States as well as enjoin the plaintiff from further exploration of them. We do not need to state in great detail the course of the litigation which followed the approval of the joint resolution. It is sufficient now to note that the contentions of government counsel were sustained in every particular, the leases were nullified and canceled, and a judgment awarded the United States for all sums realized by plaintiff from their operation. United States v. Pan-American Petroleum Co. (D.C.) 6 F.(2d) 43; Pan-American Petroleum & Transport Co. v. U.

S., 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734; United States v. Pan-American Petroleum Co. (D.C.) 45 F.(2d) 821; Id. (C.C.A.) 55 F.(2d) 753.

Plaintiff's case is predicated upon the decisions of the federal courts noted above. Reduced to the single issue involved, it is now asserted that the entire sum realized by plaintiff from the leases was not when received, and is not now, income subject to taxation under the revenue laws, because the courts held the leases to be null and void, canceled the same and decreed a judgment against the plaintiff for all sums received by it from the exploration of the same. The leases, it is contended, were void ab initio, and hence the plaintiff was a trespasser without legal or equitable title under the same. The plaintiff in legal contemplation became a constructive trustee holding said funds for the rightful owner.

The briefs of the parties to the case cite quite a number of cases. We are of the opinion that most of them are inapposite, and that the issue involved is whether the plaintiff is entitled to take a deduction for the sum involved when it was by law required to pay to the United States all monies realized from the leases, for obviously the money was finally held not to be income and did not, although in its possession, lawfully belong to plaintiff.

It is not disputed that plaintiff was compelled by the revenue laws to file an income tax return for 1925 or suffer the penalties for a failure to do so. It could not escape the payment of the tax due for that year. True, in September, 1924, the United States instituted a suit to cancel the leases, and it is conceded that plaintiff vigorously contested the case from 1924 until 1932, both sides exhausting every available jurisdiction open to them. During this period the legal status of the leases was obviously undetermined.

For two years the plaintiff was in undisturbed possession of the properties described in the leases; plaintiff received the sums involved under an absolute claim of right, and exercised complete ownership over them. For over six years it maintained and asserted the validity of the leases and its right to own the money realized from them. That it exercised without restriction the disposition of the funds is we think attested by the fact that in 1932 a receiver was appointed for the corporation, and in this record no evidence is offered to establish what, if any, sums have been paid by it towards the liquidation of the judgment heretofore mentioned.

If it were necessary to hold that the leases were voidable at the option of the United States, we would not hesitate to do so. The United States desired their cancellation and declined an option to recognize their validity. The preservation of the Naval oil reserve from exploration was the policy adopted as well as a positive disinclination to condone the manner in which the plaintiff obtained the leases.

Excerpts from the opinion of the Circuit Court of Appeals, 55 F.(2d) 753, 765, 766, 768, cited in defendant's brief, follow:

"Regardless of whether or not these particular leases were advantageous to the government, the fact that they were entered into by a faithless public officer on the one hand, and by Doheny, on the other, renders them voidable at the option of the defrauded principal—the United States of America. This fundamental principle of the law of agency is so lucidly expounded by the Supreme Court in the first Pan-American Petroleum Company Case that it almost is unnecessary to cite further authorities. * * *

"Indeed, the lower court found that 'the "E" lease was voidable at the instance of the United States, because contra bonos mores and against public policy by reason of the relations existing at the time of its execution between Doheny and Fall.' * * *

"Though it has not been shown that the Ramsey interests themselves were guilty of corrupt practices, the I lease was rendered voidable by the government for the fraud of Doheny, Ramsey's coadventurer."

In the case of North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S. Ct. 613, 76 L.Ed. 1197, the facts disclosed a question of the proper taxable year for a sum of money paid to plaintiff in exploring a section of land for oil; title to the land was in the United States. Prior to 1916, the year in which the money was paid to a receiver, the United States had instituted a suit to oust the plaintiff from possession, securing the appointment of a receiver to operate the property and hold the net income from the same. In 1917 the District Court held adversely to the government's contention; the Circuit Court of Appeals affirmed the decision of the Dis-

trict Court, and in 1922 an appeal to the Supreme Court was dismissed.

The Supreme Court, 286 U.S. 417, on page 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197, in the North American Oil Case said:

"The net profits earned by the property in 1916 were not income of the year 1922—the year in which the litigation with the government was finally terminated. They became income of the company in 1917, when it first became entitled to them and when it actually received them. If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. See Board v. Commissioner (C.C.A.) 51 F.(2d) 73, 75, 76. Compare United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 403, 47 S.Ct. 598; 71 L.Ed. 1120. If in 1922 the government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. Compare Lucas v. American Code Co., supra [280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010]."

■ We have in the instant case a situation where the government did prevail in 1932. The plaintiff, as previously observed, was in undisturbed possession of the properties, under written leases for two years, receiving the proceeds from exploration for oil and retaining the same during the progress of litigation respecting their validity. As a matter of fact, so far as this record is concerned, no proof appears disclosing to what if any extent the judgment heretofore mentioned has been liquidated. The money was income and taxable to the plaintiff until the courts determined otherwise. The remedy, if any, which the law affords is an allowable deduction in a later year. Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725; Blum v. Helvering, 64 App.D.C. 78, 74 F.(2d) 482.

■ The sum expended by the plaintiff in defending the litigation which resulted as above noted is not deductible. These expenditures are not ordinary and necessary ones under the revenue law. Gould Paper Co. v. Com'r, 26 B.T.A. 560, affirmed Gould Paper Co. v. Commissioner (C.C.A.) 72 F.(2d) 698; Murphy Oil Co. v. Burnet (C.C.A.) 55 F.(2d) 17.

The plaintiff is entitled to a judgment under the facts as stated in finding 9, where it is conceded that the Commissioner applied a rate of 21.73 per cent. as the relation which transfers of oil from leases bore to total transfers and purchases of oil. He should have applied the rate of 17.675 per cent. Judgment will be suspended awaiting a computation upon this basis or a stipulation of the parties as to the correct sum. It is so ordered.