## AGNE v. UNITED STATES.

No. 42475.

Court of Claims.

Dec. 1, 1941.

Preston B. Kavanagh, of Washington, D. C., for plaintiff.

J. A. Rees, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen.

(Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

Plaintiff in 1922 owned 20 shares of the capital stock of the Utica Sunday Tribune Company, a corporation publishing a daily newspaper in Utica, New York. A trust under the will of his father, Jacob Agne, of which trust plaintiff was the sole beneficiary, owned 122 shares of the same stock. The income tax base value of plaintiff's 20 shares was $288.76 per share and of the 122 shares in the trust was $225 per share.

Trustees of the trust were plaintiff's uncle by marriage, John C. Fulmer, and plaintiff's aunt, Amelia Agne. Fulmer was the largest individual stockholder in the Tribune Company. Plaintiff and other members of his family relied upon Fulmer's judgment in all matters respecting the Tribune Company and its stock. The family group, which included Fulmer, the estate of plaintiff's father, and plaintiff and his two aunts, owned a majority of the Tribune Company stock, 307 out of 600 shares. The balance of 293 shares was owned by eight individuals, who composed a minority group.

Early in 1922 Fulmer negotiated a deal whereby an outside purchaser offered to purchase the entire 600 shares of the Tribune Company stock for $425,000. Fulmer then bought the 293 minority shares at $300 per share and turned them over to that purchaser. At the same time he contracted with the purchaser to sell the remaining 307 shares for $337,100, or $1,098 per share. In this contract Fulmer was described as acting for himself and as trustee for the other members of his family, the majority group. The contract contained certain warranties with respect to the financial condition of the Tribune Company, certain obligations assumed by the sellers with respect to the Company's income taxes, and covenants binding the majority group not to engage in competition with the purchaser.

At the time Fulmer purchased the 293 shares of minority stock for resale, the owners of that stock understood that all the stock of the Tribune Company was to be sold, but they did not know that the stock owned by the majority group was to bring a higher price than $300 per share and they

supposed that both the majority and minority shares were to sell for the same price.

April 17, 1922, Fulmer consummated the sale of the 307 shares of the majority stock and received the purchase price in cash and notes payable to him and paid to him when due, as follows:

Cash .......................................... $137,100.00
Notes payable and paid in 1922.............. 92,500.00
Notes payable and paid in 1923.............. 25,000.00
Notes payable and paid in 1924.............. 82,500.00

The cash payment and the payments on the notes were deposited by Fulmer in a bank account in the name of "John C. Fulmer, Individually and as Trustee." On April 19, 1922, Fulmer distributed $137,100 from the account. Plaintiff received $7,508.22 and the trust under the will of plaintiff's father received $45,797.21, which it passed over to plaintiff in 1922, who thereby received a total of $53,305.43 in that year from the sale of the Tribune stock. The purchase money notes were paid to Fulmer as they fell due, and distributions were made by him in 1924 and 1925 to plaintiff and to the trust, which in turn distributed to plaintiff. The total amount received by plaintiff, including the amounts received in 1922, was $92,943.42. The trust terminated in 1925 and made complete distribution of its assets to plaintiff.

Shortly after the sales of the majority and minority stock of the Tribune Company, the minority group discovered that the sale of the majority shares had been at the price greatly in excess of that received by the minority. All the minority stockholders sued for an accounting. Three of these suits were commenced in the year 1922. The majority group, including plaintiff and the trust, were made defendants, and they, particularly Fulmer, were charged with a breach of fiduciary duty to the minority.

The first of these suits to be tried was decided in 1923, in favor of the minority stockholder. After appeal, judgment became final in 1927. Final judgments in the other suits were entered in 1932. Judgments against plaintiff and the trust totalled $124,331.90. Of this amount plaintiff has paid $75,528.35, plus interest on judgments of $16,312.39, and court costs of $3,635.05. Plaintiff also expended $15,413.57 for the expenses of litigation and suffered a loss of $75,000 on the depreciation of assets transferred by him to trustees to secure payment of the judgments. Since 1935,

plaintiff has been without any funds to make further payments on the judgments.

Plaintiff's income tax return for 1922 was filed on March 12, 1923, on a cash basis. It did not report any taxable profit on the sale of the Tribune Company stock. Attached to the return, however, was a statement relating some of the story of that sale as it had developed up to the date of the return and closing with this statement: "It is impossible for me at this time to determine what my net gain or loss will be from the transaction, owing partly to the fact that the suits are undetermined, and partly to the fact that I do not know at present what my expenses in the litigation will be. A statement at this time as to the transaction arriving at a gain or loss would be entirely guesswork. As soon as these matters are determined I will request permission to file an amended return for the year 1922."

A similar statement was attached to the tax return for 1922 of the trust of which plaintiff was the beneficiary.

The Commissioner of Internal Revenue determined that plaintiff had realized a profit in 1922 upon the sale of his own stock in the Tribune Company and also upon the sale of the stock owned by the trust under his father's will. The Commissioner's determination of profit was based upon the difference between the total sale price of the stock, less expenses, and discounts to bring the value of the notes down to their present worth, and the cost or other basis of the stock in the hands of plaintiff and the trust. Additional taxes and interest for 1922 were accordingly assessed and collected in the amount of $13,372.66. Plaintiff filed a timely claim for refund and upon its rejection instituted this suit.

Plaintiff contends that he and the trust did not, in 1922, receive from the sale of the Tribune stock any amount which could properly be regarded as gross income, because, as he contends, the transaction was incomplete. He claims, in the alternative, that if he received any amount of income, it was only $20,080.23, the amount by which the cash which he received in 1922 from the sale exceeded the stock's basis.

We think plaintiff received in 1922, within the meaning of the statute and the applicable regulations, the amount which the Commissioner used to compute his assessment. The sale of the stock was complete in that year. The warranties and covenants made by the vendors no more kept the transaction inchoate than would a warranty of title, or a covenant to observe certain building restrictions on land retained, or not to compete with the vendee, keep a sale of land from being complete for income tax purposes. Cases such as Virginia Iron, Coal & Coke Co. v. Commissioner, 4 Cir., 99 F.2d 919, involving an executory contract for the sale of land are not apposite. In such cases it cannot be determined until later whether the property will ever be sold or the taxpayer will continue to own it. If the option is not exercised or if the vendee under the contract fails to perform his part of the contract, there will be no question of capital gain or loss for the vendor will still have his capital. We conclude, therefore, that there was a completed sale in 1922.

Plaintiff's second contention is, as we have said, that assuming that there was a sale in 1922, he "received" for tax purposes in that year, only the amount which came into his hands and that of the trust, and can be taxed only on the excess of that amount over the base value of the stock. The cash and notes all came, in 1922, into the hands of Fulmer. The cash, less expenses, was distributed and plaintiff received his share. The notes had a "readily realizable market value" within the meaning of Section 202(a)(3), (c) of the Revenue Act of 1921, 42 Stat. 229, 230, and of Treasury Regulations 62 (1922 edition), article 1564. Although they were payable to Fulmer, he was the agent or trustee of plaintiff for plaintiff's proportionate share of them. If plaintiff had been the sole beneficiary of Fulmer's agency or trusteeship of the notes, he could have demanded their transfer to him. As it was, he was as much entitled to have possession of them as any partner or other co-owner is entitled to have possession of the common property. In short, his proportionate share of the notes became, in 1922, his property in the hands of his agent or trustee. In view of what is said in the next paragraph of this opinion, the fact that a small amount, some $12,000, of the funds in Fulmer's hands was in 1922 by court order subjected to a trust to satisfy the possible outcome of the Stappenback litigation does not affect our conclusion.

Plaintiff's right, as well as those of Fulmer and the other majority stockholders to retain all the proceeds of their sale, was attacked in litigation beginning in 1922, and concluding adversely to them some years

later. But this fact did not, under the authorities, postpone plaintiff's tax liability until the outcome of the litigation was known. North American Oil Consolidated v. Burnet, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L. Ed. 1197. The court said in that case: "If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." See also McDuffie, Trustee v. United States, 19 F.Supp. 239, 85 Ct.Cl. 212; Schramm v. United States, 36 F.Supp. 1021, 93 Ct.Cl. 181.

Our conclusion is that plaintiff was not overtaxed and is not entitled to recover. His petition is, accordingly, dismissed.

It is so ordered.

WHALEY, Chief Justice, and WHITAKER and LITTLETON, Judges, concur.

JONES, Judge (concurring).

I concur in the result, but for a different reason.

Plaintiff is endeavoring to escape the consequences of an illegal transaction, as disclosed by his own pleadings and the documentary evidence of record.

Since suits were filed by minority stockholders during the taxable year, 1922, the year of receipt, it is doubtful whether the taxpayer received the earnings "under a claim of right with full power of control and disposition." The exercise of any such power over a portion, at least, of such funds was prevented by court order made in 1922.

Even conceding that the taxes were properly assessed in 1922, there is some question whether plaintiff might not have the right to a refund on the facts, later revealed, showing that he did not own a certain percentage of the monies and notes that were received, but that such percentage actually belonged to the minority stockholders. On that percentage plaintiff had paid taxes on property that belonged not to him but to others.

On account of the apparent fraud on the minority stockholders, with which plaintiff was intimately connected, or at least had knowledge and with such knowledge became, or was willing to become, the beneficiary, he is not equitably entitled to recover.

To avoid any possibility that a subsequent taxpayer with a just cause might be foreclosed on the other issues, I prefer to place the decision on the latter ground.

Plaintiff having sought to benefit from an illegal transaction may not now recover on the showing that his attempt failed.